The PEOPLE of the State of Colorado, Plaintiff–Appellant,

v.

James Francis WARNER, Defendant–Appellee.

The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

James Francis WARNER, Defendant–Appellant.

Nos. 96SA70, 96SA89.

Supreme Court of Colorado, En Banc.

Dec. 16, 1996.

David J. Thomas, District Attorney, First Judicial District, Donna Skinner Reed, Chief Deputy District Attorney, Golden, for the People.

Stephen H. Duitch, Colorado Springs, for James Francis Warner.

Justice KIRSHBAUM delivered the opinion of the Court.

These consolidated cases require this court to review the propriety of two rulings entered by the trial court: whether the trial court properly dismissed three felony counts filed against James Francis Warner, appellant in Case No. 96SA89 and appellee in Case No. 96SA70, and whether the trial court properly denied Warner's motion to dismiss two remaining misdemeanor counts in this case. In denying Warner's motion, the trial court concluded the provisions of section 18–1–405, 8B C.R.S. (1986), governing Warner's right to a speedy trial were tolled pending resolution of an appeal filed by the People, appellant in Case No. 96SA70 and appellee in Case No. 96SA89, seeking reversal of the trial court's order dismissing the felony counts. We affirm the trial court's rulings.

1. § 18–4–204, 8B C.R.S. (1986).

2. § 18–4–205, 8B C.R.S. (1986).

3. § 18–2–201, 8B C.R.S. (1986).

4. § 18–4–401, 8B C.R.S. (1986).

5. § 18–20–107, 8B C.R.S. (1996 Supp.). The People assert in their brief that Warner was also charged with a sixth count of the misdemeanor offense of "cheating game and devices," pursuant to § 18–20–110, 8B C.R.S. (1996 Supp.).

I

The record establishes the following facts. In December 1994, Warner and two accomplices allegedly visited the Eureka Casino in Blackhawk and used a device referred to as a "light wand" to illegally obtain tokens from a slot machine. Warner was arrested and posted bond. Based upon this act, the People filed an information against Warner charging him with three felony offenses defined by the criminal code: third-degree burglary,[1] possession of burglary tools,[2] and conspiracy to commit third-degree burglary.[3] The information also alleges two misdemeanor offenses against Warner: theft[4] and fraudulent acts while participating in gaming activities.[5] The fraudulent act misdemeanor offense constitutes a violation of the Limited Gaming Act of 1991. §§ 12–47.1–101 to –1401, 5B C.R.S. (1991) (the Act).[6] On April 28, 1995, Warner entered pleas of not guilty to all of the charges. Pursuant to section 18–1–405(1), 8B C.R.S. (1986), Warner was entitled to a trial within six months of that date. A trial was scheduled for September 5, 1995.

On July 21, 1995, Warner filed a motion to dismiss the three felony counts, arguing that he could not be prosecuted for these general offenses because the General Assembly had in effect precluded prosecution for such general offenses by including more specific offenses relating to his alleged conduct in the Act. Citing *People v. Bagby*, 734 P.2d 1059 (Colo.1987), the trial court concluded that in adopting the Act and its specific provisions prohibiting conduct associated with gaming, the General Assembly intended to preclude prosecution for such conduct under the more general criminal statutes. Accordingly, the trial court granted Warner's motion to dismiss the three felony counts on August 18, 1995.

However, the record before us indicates that although the information filed against Warner contains a sixth count, the person named therein is not Warner but rather one of Warner's alleged co-conspirators.

6. Those sections of the Act which define criminal offenses are reproduced verbatim in article 20 of the Criminal Code, entitled Offenses Related to Limited Gaming. §§ 18–20–101 to –115, 8B C.R.S. (1996 Supp.).

On September 1, 1995, the People appealed the trial court's August 18, 1995, order to the court of appeals, pursuant to section 16–12–102, 8A C.R.S. (1996 Supp.).[7] On September 5, 1995, the trial court vacated the trial set for that date, holding that all trial proceedings must be stayed pending resolution of the People's appeal. Warner objected, asserting that any delay beyond October 28, 1995, would violate his statutory right to a speedy trial.

On November 3, 1995, Warner filed a motion to dismiss the remaining misdemeanor counts, asserting a violation of his statutory right to a speedy trial. On January 2, 1996, the trial court entered an order denying Warner's motion. The trial court concluded that the People's appeal constituted an interlocutory appeal; that pursuant to section 18–1–405(6)(b), 8B C.R.S. (1986), the speedy trial statute was tolled pending resolution of the People's interlocutory appeal; and that the trial court lacked jurisdiction to grant Warner's motion absent an order by the court of appeals remanding the case to the trial court for that purpose. In early February 1996, Warner filed a notice of appeal with the court of appeals seeking reversal of the trial court's refusal to dismiss the misdemeanor counts.[8]

On February 20, 1996, pursuant to section 13–4–110(1)(a), 6A C.R.S. (1987), the court of appeals referred the People's pending appeal, Case No. 95CA1520, to this court for a determination of jurisdiction. We accepted jurisdiction of the People's appeal on February 26.[9]

On March 5, 1996, Warner filed a petition for writ of mandamus in this court, pursuant to C.A.R. 21, requesting this court to order the trial court to dismiss the misdemeanor counts, or, alternatively, to order the court of appeals to certify Warner's pending appeal to this court "to be combined and consolidated" with the People's pending appeal.[10] On March 7, 1996, we entered an order transferring Warner's appeal to this court and consolidating Warner's appeal with the People's

appeal. As a result, Warner's petition requesting this court to exercise its original jurisdiction is moot.

## II

The People assert that the trial court erred in dismissing the three felony counts filed against Warner. We disagree.

For the alleged act of using a light wand to illegally obtain tokens from a slot machine, the People charged Warner with the felony offenses of third-degree burglary, possession of burglary tools, and conspiracy to commit third-degree burglary. Third-degree burglary is defined, in relevant part, as follows:

> A person commits third degree burglary if with intent to commit a crime he enters or breaks into any vault, safe, cash register, coin vending machine, product dispenser, money depository, safety deposit box, coin telephone, coin box, or other apparatus or equipment whether or not coin operated.

§ 18–4–204(1), 8B C.R.S. (1986). Possession of burglary tools is defined as follows:

> A person commits possession of burglary tools if he possesses any explosive, tool, instrument, or other article adapted, designed, or commonly used for committing or facilitating the commission of an offense involving forcible entry into the premises or theft by a physical taking, and intends to use the thing possessed, or knows that some person intends to use the thing possessed, in the commission of such an offense.

§ 18–4–205(1), 8B C.R.S. (1986). The conspiracy charge was based on the alleged burglary offense.

The Act also defines a number of offenses specifically related to limited stakes gambling activities. Those sections of the Act establishing such offenses are codified verbatim in article 20 of the Criminal Code. §§ 18–20–101 to –115, 8B C.R.S. (1996 Supp.) (Offenses Related to Limited Gaming). One of these offenses, entitled "Use of counterfeit or

7. This appeal was assigned Case No. 95CA1520.

8. This appeal was assigned Case No. 96CA0293.

9. We assigned that appeal Case No. 96SA70.

10. We assigned this proceeding Case No. 96SA89.

unapproved chips or tokens or unlawful coins or devices—possession of certain unlawful devices, equipment, products, or materials," provides in pertinent part as follows:

> It is unlawful for any person to use or possess while on the premises [of a licensed gaming establishment] any cheating or thieving device, including but not limited to, tools, drills, wires, coins, or tokens attached to strings or wires or electronic or magnetic devices, to facilitate the alignment of any winning combination or to facilitate removing from any slot machine any money or contents thereof, unless the person is a duly authorized gaming employee acting in furtherance of his or her employment.

§ 12–47.1–825(7), 5B C.R.S. (1991); § 18–20–109(7), 8B C.R.S. (1996 Supp.). As applied to acts allegedly committed by Warner, this offense is classified as a misdemeanor offense. § 12–47.1–825(8), 5B C.R.S. (1991); § 18–20–109(8), 8B C.R.S. (1996 Supp.).

This offense describes Warner's alleged conduct more precisely than the much broader language of the statute prohibiting burglary with which Warner was charged. In *People v. Bagby*, 734 P.2d 1059 (Colo.1987), the defendant was charged with the general felony offense of offering a false instrument for recording for having falsely filled out a liquor license application. § 18–5–114, 8B C.R.S. (1985). The same conduct was more specifically proscribed by various sections and implementing regulations of the Colorado Liquor Code. § 12–47–129(4)(a), 5 C.R.S. (1985); Revenue Regulation 47–107.1, 1 C.C.R. 203–2. The Liquor Code also provided that such violations were to be punished as misdemeanors. § 12–47–130, 5 C.R.S. (1985). We noted that while ordinarily section 18–1–408(7), 8B C.R.S. (1986), grants a prosecutor discretion to charge any or all applicable offenses, prosecution under a general criminal statute may nonetheless be barred where "a legislative intent is shown to limit prosecution to [a] special statute." *Bagby*, 734 P.2d at 1061 (citations omitted).

We concluded that in adopting the Liquor Code the General Assembly intended the specific provisions of that statute to supplant the more general provisions of the Criminal Code with respect to conduct arguably violating both statutory schemes. *Bagby*, 734 P.2d at 1062. In support of that conclusion we noted .that in adopting the Liquor Code the General Assembly invoked the full police power of the state; that the Liquor Code created a comprehensive regulatory program; and that the Liquor Code carefully defined different types of offenses in considerable detail, often with particularized references to specific provisions of the Criminal Code. *Id.* Given these features of the Liquor Code, we concluded that the General Assembly clearly intended the filing of false statements on liquor license applications to be prosecuted under the specific provisions of the Liquor Code relating to that precise offense, rather than under the general criminal statute prohibiting the recording of a false instrument. *Id.*

■ The reasoning of *Bagby* supports a similar conclusion here. Like the Liquor Code, the Act invokes the full extent of the state's police powers. § 12–47.1–102(c), 5B C.R.S. (1991); § 18–20–101, 8B C.R.S. (1996 Supp.). The Act creates a comprehensive and thorough regulatory scheme to control all aspects of limited stakes gambling in Colorado. Finally, the criminal offenses defined in the Act are not only specifically related to gambling and defined in extraordinary detail, but they are reproduced verbatim in the Criminal Code. *Compare* §§ 12–47.1–603, –802, –803, –822 to –829, –838 and –839, 5B C.R.S. (1991) *with* §§ 18–20–103 to –114, 8B C.R.S. (1996 Supp.). These factors indicate that in adopting the Act the General Assembly intended that conduct violating the specific offenses defined therein be prosecuted pursuant to the Act or article 20 of the Criminal Code rather than under the applicable but far more general offenses defined in other sections of the Criminal Code.

Warner's alleged conduct consisted of the unlawful use of an electronic device to remove tokens from a slot machine. The General Assembly has prohibited such conduct in specific provisions of the Act and has demonstrated its intent that such conduct be punished pursuant to these provisions. *Bagby*, 734 P.2d at 1062; *see also People v. O'Donnell*, 926 P.2d 114 (Colo.App.1996) (defen-

dant's act of providing alcohol to minors was specifically defined as a misdemeanor offense in the Liquor Code, and could not be prosecuted as the general felony offense of contributing to the delinquency of a minor), *cert. denied,* No. 96SC249 (Colo. Oct. 28, 1996). The People therefore had no discretion to charge Warner with correlative violations of the Criminal Code. In granting Warner's motion to dismiss the three felony charges, the trial court reached this conclusion. We therefore affirm the trial court's August 18, 1995, order.[11]

## III

Warner argues in his appeal that the trial court erred in denying his motion to dismiss the pending misdemeanor offenses. We reject this argument, though for reasons differing from those underlying the trial court's conclusion.

In his motion to dismiss the misdemeanor counts, Warner asserted that he was entitled to a trial on those counts no later than October 28, 1995, and that the People's appeal of the trial court's August 18 order dismissing the three felony counts pursuant to section 16–12–102, 8A C.R.S. (1986), did not toll the operation of the speedy trial statute. In response, the People argued that the appeal was interlocutory in nature, that the filing of such an interlocutory appeal divested the trial court of jurisdiction to proceed to trial on the remaining misdemeanor counts, and that all trial proceedings would have to be stayed pending the outcome of the People's appeal. The trial court held that the People's appeal was interlocutory in nature and that therefore, pursuant to section 18–1–405(6)(b), 8B C.R.S. (1996 Supp.), the period of time necessary for the resolution of the appeal was excluded from the six-month statutory speedy trial time limit relied upon by Warner.[12] In so ruling, the trial court relied on our decision in *People v. Ferguson,* 653 P.2d 725 (Colo.1982). In *Ferguson,* we described an interlocutory appeal as "an appeal of a matter which is not determinable of the controversy, but which is necessary for a suitable adjudication of the merits." *Id.* at 727. The trial court observed that although the People's appeal was not determinative of the entire case against Warner because the misdemeanor counts remained to be tried, the appeal was nevertheless necessary because the People might be barred from reinstating the felony charges in the event the appellate court were to reverse the trial court's order and determine that the felony charges as filed were not preempted by the Act. The trial court also noted that this court has emphasized the importance of judicial economy and compulsory joinder in such circumstances, disfavoring any procedure which would sever the counts of a single information into two or more trials. *People v. Beyette,* 711 P.2d 1263, 1267 (Colo.1986).[13]

Warner argues that the trial court erred in concluding that the People's appeal was interlocutory in nature. We do not resolve the question inherent in this argument because the trial court's determination that the speedy trial statute was tolled during the pendency of the People's appeal is correct for

11. Warner also argues that the People's appeal should be dismissed because it is patently meritless. We do not view the People's appeal as frivolous, and therefore reject Warner's argument.

12. Section 18–1–405, 8B C.R.S. (1996 Supp.), provides, in pertinent part:

> (6) In computing the time within which a defendant shall be brought to trial as provided in subsection (1) of this section, the following periods of time shall be excluded:

> . . . .

> (b) The period of delay caused by an interlocutory appeal whether commenced by the defendant or by the prosecution.

13. The trial court also concluded that, absent an order by the court of appeals remanding the case to the trial court, the trial court lacked jurisdiction to determine Warner's motion to dismiss the misdemeanor counts. Upon the filing of a notice of appeal in a criminal case in the appropriate appellate court, that appellate court obtains jurisdiction over the entire case and, absent an order of remand, the trial court has no jurisdiction to conduct further proceedings therein. C.A.R. 1(a); *Molitor v. Anderson,* 795 P.2d 266 (Colo. 1990). In view of the basis for our disposition of these cases, we do not address Warner's suggestion that the trial court did have jurisdiction to determine his motion to dismiss the misdemeanor counts.

another reason.[14]

The People's appeal of the trial court's August 18, 1995, order dismissing the felony charges against Warner was precipitated by Warner's motion to dismiss those charges. The People's argument for tolling the speedy trial statute as to the remaining misdemeanor counts stems in large measure from the equitable notion that the People should be afforded an opportunity to test the trial court's dismissal of the felony charges through an appeal without having to forego prosecution of the remaining misdemeanor charges due to double jeopardy or compulsory joinder concerns. *See Beyette,* 711 P.2d at 1266–67.

We were confronted with a similar situation in *People v. Jamerson,* 198 Colo. 92, 596 P.2d 764 (1979). There, we made the following pertinent observations concerning the speedy trial implications of an appeal which is triggered by a trial court's order granting a defendant's motion to dismiss:

> The resolution of this issue lies in the fact that the *defendant,* not the state, presented the motion to dismiss which led to the appeal. . . . The prosecution must be allowed to respond to [the defendant's motion to dismiss certain charges] by testing the trial court's ruling on appeal. The delay was not occasioned by the prosecutor's action, but by the defendant's own motion. We therefore hold that the period of time necessary to go through the appellate process, where the appeal stems from a dismissal upon the defendant's motion, tolls the statutory speedy trial period. The provision governing this situation is section 18–1–405(6)(f):
>
> "(6) In computing the time within which a defendant shall be brought to trial . . . ,

14. The manner in which the People seek appellate review of a trial court's order dismissing some counts of a multi-count information may determine whether that appeal is interlocutory in nature and, therefore, tolls the speedy trial statute pursuant to § 18–1–405(6)(b), 8B C.R.S. (1996 Supp.).

The People have a right to appeal a trial court's order dismissing some counts of a multi-count information. *People v. Young,* 814 P.2d 834, 837 (Colo.1991); *People v. Jefferson,* 748 P.2d 1223, 1224–25 (Colo.1988); *see People v. Pedrie,* 727 P.2d 859, 861 n. 6 (Colo.1986). Such appeals are authorized by § 16–12–102(1), 8A C.R.S. (1986), which provides in pertinent part as follows:

(1) The prosecution may appeal any decision of the trial court in a criminal case upon any question of law. . . . The procedure to be followed in filing and prosecuting appeals under this section shall be as provided by applicable rule of the supreme court of Colorado.

In *Young,* we contrasted § 16–12–102(1) with § 16–12–102(2), 8A C.R.S. (1986), which latter statute provides for interlocutory appeals of trial court rulings relating to suppression of evidence, return of property to the defendant, and change of venue. We held that by specifically authorizing interlocutory appeals only for these matters, the General Assembly by implication had determined that appeals of other questions of law pursuant to § 16–12–102(1) were not interlocutory in nature. *Young,* 814 P.2d at 837. While interlocutory appeals under subsection (2) are to be filed in the supreme court under C.A.R. 4.1, non-interlocutory appeals under subsection (1) are governed by C.A.R. 1. We emphasized that "dismissal of a charge from a multi-count information [is] a 'final judgment' for purposes of appellate review under C.A.R. 1(a)(1)." *Id.*

The court of appeals has jurisdiction over appeals from final judgments. § 13–4–102(1), 6A C.R.S. (1987). Here, the People appealed the trial court's dismissal of the felony counts to the court of appeals pursuant to § 16–12–102(1) and C.A.R. 1(a)(1). Under our analysis in *Young,* this appeal was not an interlocutory appeal, but in fact an appeal of a final judgment. It thus did not toll the speedy trial statute under § 18–1–405(6)(b), 8B C.R.S. (1996 Supp.).

A different conclusion would result had the People sought this court's review of the trial court's order dismissing the felony counts in an original proceeding filed pursuant to C.A.R. 21. We have held that "an original proceeding initiated in good faith by either the defense or the prosecution constitutes an 'interlocutory appeal' for purposes of the speedy trial statute." *People v. Ferguson,* 653 P.2d 725, 728 (Colo.1982).

Our cases thus hold that when the People seek review of a trial court's order dismissing some counts of a multi-count information in this court through an original proceeding under C.A.R. 21, the action is deemed an interlocutory appeal and the speedy trial statute is tolled. *Ferguson,* 653 P.2d at 728; *People v. Beyette,* 711 P.2d 1263, 1266 (Colo.1986). On the other hand, when the People file an appeal in the court of appeals pursuant to § 16–12–102(1), there is no basis in statute or rule for treating the appeal as interlocutory in nature. *People v. Gallegos,* 926 P.2d 156, 162 (Colo.App.1996), *cert. granted,* No. 96SC373 (Colo. Oct. 28, 1996); *accord Young,* 814 P.2d at 837 (treating such appeals as appeals from final judgments and not interlocutory appeals, although not addressing the issue of tolling of the speedy trial statute).

the following periods of time shall be excluded:

. . .

"(f) The period of any delay caused at the instance of the defendant." *See also,* Crim. P. 48(b)(6)(VI).

*Jamerson,* 198 Colo. at 95–96, 596 P.2d at 767 (emphasis in original). *Cf. Ferguson,* 653 P.2d at 726 (declining to reach the question of whether delay occasioned by an original proceeding should be excluded from speedy trial period under section 18–1–405(6)(f) because the original proceeding was deemed an interlocutory appeal which was excluded from the speedy trial statute under section 18–1–405(6)(b)).

■ The principle articulated in *Jamerson* is applicable to the circumstances of this case. Thus, the time necessary to determine the People's appeal is chargeable to Warner and is to be excluded from speedy trial computations pursuant to section 18–1–405(6)(f), 8B C.R.S. (1996 Supp.). Accordingly, the trial court correctly determined that Warner's statutory right to a speedy trial has not been violated in this case.[15]

■ Warner also argues that even if he has not been denied his statutory right to a speedy trial, the misdemeanor counts should nevertheless be dismissed for equitable reasons. He maintains that the People's appeal of the trial court's order dismissing the felony counts is so patently meritless that it should be viewed as a groundless delaying tactic—precisely the sort of arbitrary and oppressive prosecutorial treatment which the speedy trial statute is designed to prevent. *See* § 18–1–102(1)(d), 8B C.R.S. (1986); *cf. People v. Romero,* 801 P.2d 1192, 1195 (Colo. 1990). Whatever the merits of this argu-

ment, it was not raised in the motion to dismiss the misdemeanor counts filed by Warner. We therefore will not address it in this appeal. *See People v. Davis,* 194 Colo. 466, 470, 573 P.2d 543, 546 (1978).

### IV

For the foregoing reasons, we affirm the trial court's ruling in Case No. 96SA70 dismissing the charges against Warner for the felony offenses of third-degree burglary, possession of burglary tools and conspiracy to commit third-degree burglary. We also affirm the trial court's ruling in Case No. 96SA89 that the provision of section 18–1–405(1) is tolled pending our resolution of the People's appeal here. The matter is remanded to the trial court for further proceedings consistent with this opinion.

MULLARKEY, J., concurs in part and dissents in part, and VOLLACK, C.J., and SCOTT, J., join in the concurrence and dissent.

Justice MULLARKEY, concurring in part and dissenting in part:

I respectfully dissent from the majority's conclusion in part II of its opinion that the general statutory provisions in the Criminal Code dealing with burglary are necessarily supplanted by the specific provisions of the Limited Gaming Act of 1991 (Gaming Act). In *People v. Bagby,* 734 P.2d 1059 (Colo. 1987), the case upon which the majority relies, we held that prosecution under a more general statute may be barred if "a legislative intent is shown to limit prosecution to [a] special statute." *Id.* at 1061. In my view,

---

**15.** In addition to the above methods of tolling the speedy trial statute, we note that the People may seek to stay proceedings in the trial court while they seek appellate review of a trial court decision pursuant to § 16–12–102(1). As we observed in *Beyette:*

> If the circumstances of a case make it legitimately impossible for the People to comply with speedy trial requirements, statutorily authorized remedies can be sought by filing a motion for a continuance and establishing that the case falls within the exception for "felony cases ... [where] additional time is justified because of exceptional circumstances of the

case." § 18–1–405(6)(g)(II) (1978 & 1985 Supp.).

*Beyette,* 711 P.2d at 1267. Here, the People sought no such stay.

We note, however, that a defendant's right to a speedy trial may not be ignored in weighing the justification for such a stay of proceedings. *Cf. People v. Romero,* 801 P.2d 1192, 1195 (Colo. 1990) (the prosecution's ability to file interlocutory appeals may be "limited out of concern that the prosecution may 'wear down' the defendant by taking an interlocutory appeal and because of the defendant's interest in the swift resolution of the case.").

such an intent was neither expressed nor implied by the Gaming Act.

In *Bagby,* the defendant falsified a liquor license application. *Bagby,* 734 P.2d at 1060. The defendant was charged with the felony offense of offering a false instrument for recording.[1] *Id.* The same conduct, however, also was proscribed by more specific sections and implementing regulations of the Colorado Liquor Code. § 12–47–129(4)(a), 5 C.R.S. (1985); Revenue Regulation 47–107.1, 1 C.C.R. 203–2. Under the Liquor Code, falsifying a liquor license application is punishable as a misdemeanor. § 12–47–130, 5 C.R.S. (1985). The defendant in *Bagby* argued that the more specific provisions of the Liquor Code precluded the District Attorney from charging him with the felony offense of offering a false instrument for recording. *Bagby,* 734 P.2d at 1060–61.

We agreed with the defendant and stated in *Bagby* that "enactment by the General Assembly of a specific criminal statute does not preclude prosecution under a general criminal statute unless a legislative intent is shown to limit prosecution to the special statute." *Bagby,* 734 P.2d at 1061. In that case, three characteristics of the Liquor Code convinced us that the General Assembly intended to supplant general criminal law. First, the Liquor Code invoked the full extent of the state's police power. *Id.* at 1062. Second, the Liquor Code created a comprehensive regulatory program with detailed descriptions of the licensing process. *Id.* Third, the Liquor Code carefully defined different types of offenses in detail, often with particularized references to specific provisions of the Criminal Code. *Id.* The majority now finds that these same characteristics are evident in the Gaming Act and that, under *Bagby,* no burglary charges could be brought against the defendant now before us. *See* maj. op. at 568. I disagree.

The key to the *Bagby* decision was the General Assembly's express declaration that the Liquor Code was adopted as an expression of the full police power of the state. *Bagby,* 734 P.2d at 1062. When we decided *Bagby,* section 12–47–102(1) specifically stated:

> The general assembly hereby declares that this article shall be deemed an exercise of the *police powers of the state* for the protection of the economic and social welfare and the health, peace, and morals of the people of this state....

§ 12–47–102(1), 5B C.R.S. (1985)(emphasis added). We concluded in *Bagby* that the explicit language of this legislative declaration showed that the General Assembly "exercised the full police power of the state and considered the full range of possible sanctions in selecting those most appropriate for violations of the liquor code." *Bagby,* 734 P.2d at 1062.

In contrast to the Liquor Code, the Gaming Act contains no express invocation of the state's police power. The majority, however, cites two statutory provisions as being equivalent to the Liquor Code provision on police power.[2] *See* Maj. op. at 568. Section 12–47.1–102(c) of the Gaming Act states:

> All establishments where limited gaming is conducted and where gambling devices are operated and all manufacturers, sellers, and distributors of certain gambling devices and equipment must therefore be licensed, controlled, and assisted to protect the public health, safety, good order, and the general welfare of the inhabitants of the state to foster the stability and success of limited gaming and to preserve the economy and policies of free competition of the state of Colorado.

§ 12–47.1–102(c), 5B C.R.S. (1991). The other provision cited by the majority, section 18–20–101 of the Criminal Code, provides:

> The general assembly hereby finds, determines, and declares that the strict control of limited gaming in this state is necessary for the immediate and future preservation of the public peace, health, and safety.

---

1. § 18–5–114, 8B C.R.S. (1986).

2. The legislation at issue established unlawful acts related to limited gaming which are codified in the Gaming Act at §§ 12–47.1–801 to –839, 5B C.R.S. (1991 & 1996 Supp.). Some of these unlawful acts are also reproduced in the Criminal Code at §§ 18–20–101 to—115, 8B C.R.S. (1996 Supp.). *See* Act approved June 4, 1991, ch. 263, sec. 1 & 11, 1991 Colo. Sess. laws 1521.

§ 18–20–101, 8B C.R.S. (1996 Supp.). Neither provision refers to the state's police power or contains any other language indicating any legislative intent to preempt the application of the Criminal Code.

Given the lack of express language addressing this issue, the next question is whether an intent to preempt can be reasonably inferred from the Gaming Act. To resolve this question, I have turned to the legislative history. There I found no stated intent to preempt the Criminal Code but rather an intent to supplement the Criminal Code with the addition of newly defined crimes. For example, one of the Gaming Act's sponsors, Senator Hopper, in presenting the bill[3] to the Senate Business Affairs and Labor Committee, described the enforcement provisions as

> a mishmash ... [of] several unlawful acts that were just conforming legislation to other parts of the law.... We also have under Article [20] some new offenses related to limited gaming that we hadn't had use for before and hopefully will not have use for in the future, but just in case we do, they are all there.

*Hearing on S.B. 91–149 Before the Senate Business Affairs and Labor Committee,* 58th Gen. Assembly, 1st Reg. Sess. (hearing tape 91–8, Feb. 7, 1991, at 2:27 p.m.). This statement by the bill's sponsor supports my conclusion that the new criminal provisions related to gambling were additive only and were not intended as a comprehensive replacement for the existing crimes defined in the Criminal Code.

However, the majority contends that, similar to the Liquor Code, the Gaming Act "creates a comprehensive and thorough regulatory scheme to control all aspects of limited stakes gambling in Colorado." Maj. op. at 568. In *Bagby,* we concluded that the Liquor Code's "detailed descriptions of the licensing process and specific directions to licensing authorities concerning the exercise of regulatory power ... indicate[d] a thorough legislative consideration of all aspects of the licensing process, including the fashioning of appropriate sanctions." *Bagby,* 734 P.2d at 1062. Since the conduct of that

defendant directly involved a fraudulent attempt to circumvent the licensing process, we held that it was appropriate for the sanctions of the Liquor Code to supplant the more general provisions of the Criminal Code. *Id.*

The legislative history of the Gaming Act does not support the majority's analysis. In addition to Senator Hopper's statement, the Senate Business Affairs and Labor Committee heard testimony from Donald Mielke, District Attorney for the First Judicial District, who helped develop and draft the Gaming Act's criminal provisions. He emphasized that the bill drafters were concerned with the need for new enforcement provisions to prevent abuse by licensed operators. Mielke testified,

> if it is the operator or if it is the distributor that is running the slot machine, and they tamper [with] that slot machine to the detriment of the public and steal ten thousand dollars from one machine, or whatever dollar [amount] it might be ... we could not go under the theft statute and file a felony theft, because it's over three hundred dollars, because we would not have a victim that we could identify. I mean everybody comes in, puts in their dollar, does whatever, and goes on to the next machine. Because Colorado law specifically says, for theft, you cannot [file charges] unless you specify the victim of the theft and the amount of the theft, that even though that machine stole ten thousand dollars we could not file against the owner or the operator who tampered [with] that machine ... because the theft statutes require the naming of the victim and the naming of the amount. So we need the felony for that offense for the licensed person.

*Hearing on S.B. 91–149 Before the Senate Business Affairs and Labor Committee,* 58th Gen. Assembly, 1st Reg. Sess. (hearing tape 91–8, Feb. 7, 1991, at 2:37 p.m.). The testimony of District Attorney Mielke shows that the Gaming Act's criminal provisions were intended to cover specific gaps which prosecutors had identified in the existing crimes defined in the Criminal Code.

**3.** The Limited Gaming Act of 1991 was introduced as Senate Bill 91–149.

The majority's final rationale for finding preemption is based upon its finding of a parallel between the Gaming Act and the Liquor Code with respect to each Act's reference to the Criminal Code. Maj. op. at 568. In my view, the two statutes are not comparable. When *Bagby* was decided, section 12-47-130, 5B C.R.S. (1985) of the Liquor Code defined a limited number of offenses with particularized references to specific provisions of the Criminal Code. *Bagby*, 734 P.2d at 1062. We concluded that this selective incorporation of portions of the Criminal Code into the Liquor Code indicated a legislative determination that all other violations of the Liquor Code should be prosecuted only under the Liquor Code's penal provisions. *Id.* By contrast, *all* of the Gaming Act's penal provisions are reproduced verbatim in the Criminal Code. *See* §§ 18–20–101 to –115, 8B C.R.S. (1996 Supp.). Citing the *Bagby* rationale, the majority asserts that by reproducing the Gaming Act's penal provisions in the Criminal Code verbatim, the General Assembly has demonstrated an intent to limit the punishment of illegal conduct related to limited gaming to the specific provisions of the Gaming Act. I disagree.

There is a distinct difference between an organic act (*i.e.*, the Liquor Code) which makes particular references to the Criminal Code in order to delineate which act controls certain types of offenses, and an organic act (*i.e.*, the Gaming Act) whose criminal provisions are reproduced verbatim in the Criminal Code. Unlike the Liquor Code, the Gaming Act is not a self-contained body of law with specific limited references to the Criminal Code. Incorporation of the Gaming Act violations into the Criminal Code indicates to me that the two statutes are of equal stature and are intended to complement each other. My reading is supported by Senator Hopper who testified to the Conference Committee that the criminal provisions were reproduced in both Title 12 and Title 18 as a result of a "compromise" between the Department of Revenue and the law enforcement community. *Hearing on S.B. 91–149 Before the House and Senate Conference Committee*, 58th Gen. Assembly, 1st Reg. Sess. (hearing tape 91–34, March 7, 1991, at 8:30 a.m.). "Compromise" does not indicate an intent to

have one set of laws prevail over the other. Thus, I see no basis for the majority's conclusion that the General Assembly intended to restrict prosecutorial discretion in these types of cases.

Finally, I point out that the majority's conclusion is contrary to New Jersey case law, and New Jersey is one of the states from which the language of the Gaming Act criminal provisions was taken. Both Senator Hopper and District Attorney Mielke testified to the Senate Business Affairs and Labor Committee that they considered New Jersey law in developing the criminal provisions of the Gaming Act. *Hearing on S.B. 91–149 Before the Senate Business Affairs and Labor Committee*, 58th Gen. Assembly, 1st Reg. Sess. (hearing tape 91–8, Feb. 7, 1991, at 2:25 p.m. & 2:34 p.m.). Similar to Colorado's Gaming Act, New Jersey's Casino Control Act defines specific crimes related to gambling. N.J.Rev.Stat. § 5:12–1 to –203 (1996). In *State v. Stelzner*, 257 N.J.Super. 219, 608 A.2d 386 (App.Div.1992), the appellate division of the New Jersey superior court, confronted with the same issue now before us, upheld the convictions of defendants involved in a scheme to defraud a casino by cheating at cards. *Id.* 608 A.2d at 389.

In *Stelzner*, the defendants illegally won over $150,000 and were convicted under the Casino Control Act for swindling and under the general criminal code for theft by deception. *Id.* at 387. The theft by deception statute allowed for felony convictions in the second and third degree, while the Casino Control Act only provided for a felony conviction in the fourth degree. Like this case, the defendants argued that the more specific provisions of the Casino Control Act indicated a legislative intent to limit prosecutions of gambling offenses to that Act. In New Jersey, as in Colorado, the "question of whether a specific act containing a criminal offense bars prosecution under a more generally applicable criminal statute is a matter of legislative intent." *Id.* at 396. The *Stelzner* court held, however, that despite the fact that the casino industry in New Jersey was heavily regulated, there was no evidence that the legislature intended to limit casino theft

prosecutions to the provisions of the Casino Control Act. *Id.* at 396–97.

Although certainly not binding, the *Stelzner* court's rationale is persuasive here. Neither the plain language of the Gaming Act nor its legislative history supports the majority's conclusion that the General Assembly intended to prevent prosecutors from filing general criminal charges in cases like the one before us. To the contrary, the inclusion of these new criminal provisions was a result of law enforcement concerns that the existing statutes would not address certain criminal conduct as applied to owners and operators. Further, it stands to reason that these suggestions were made by the law enforcement community to *supplement* the Criminal Code and not to limit the discretion of prosecutors.

We have explained that "[t]he Colorado Constitution establishes the office of the district attorney and vests in the office ... the discretion to determine the charges that will be filed." *Gansz v. People,* 888 P.2d 256, 257–58 (Colo.1995). We also have held that "[w]here a single transaction may violate two criminal statutes, it is well settled that no constitutional proscription exists which prohibits a district attorney from exercising his prosecutorial discretion in determining under which statute to prosecute." *People v. Wellington,* 633 P.2d 1390, 1391 (Colo.1981). While *Bagby* indicates that the discretion of a prosecutor can be restricted by the legislature, the *Bagby* rationale is only applicable to legislative acts that clearly show an intent by the General Assembly to preclude prosecution under the general criminal statute. That is not the case here.

Accordingly, I would reverse and direct the trial court to reinstate the felony charges. In my opinion, the General Assembly did not intend to limit prosecutorial discretion for violations of the Gaming Act. I agree, however, with the majority opinion that the speedy trial provision of section 18–1–405(1), 8B C.R.S. (1986), is tolled pending our resolution of the People's appeal. Therefore, I concur in part and dissent in part.

I am authorized to say that Chief Justice VOLLACK and Justice SCOTT join in this dissent.