**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Kevin FEARS, Defendant–Appellant.**

No. 93CA0720.

Colorado Court of Appeals, Div. V.

Aug. 7, 1997.

Rehearing Denied Sept. 18, 1997.

Certiorari Denied Aug. 31, 1998.

Gale A. Norton, Attorney General, Stephen K. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, Clemmie P. Engle, Senior Assistant Attorney General, Denver, for Plaintiff–Appellee.

David F. Vela, Colorado State Public Defender, Douglas D. Barnes, Deputy State Public Defender, Denver, for Defendant–Appellant.

Opinion by Justice ERICKSON.*

Defendant, Kevin Fears, appeals the judgment of conviction entered upon jury verdicts

---

* Sitting by assignment of the Chief Justice under provisions of the Colo. Const. art. VI, Sec. 5(3), and § 24–51–1105, C.R.S. (1996 Cum.Supp.).

finding him guilty of two counts of first degree murder, attempted first degree murder, conspiracy to commit first degree murder, intimidation of a witness, second degree assault, and first degree burglary. We affirm.

The June 1989 murders and attempted murder underlying the convictions in this case have their genesis in a September 1988 robbery at Denver's Parkside Cafe (for which defendant was not prosecuted). A robbery occurred when the assistant manager of the Parkside Cafe, Cheryl Kaai (Kaai), closed the restaurant and walked to her car with a waiter, Frank Magnuson (Magnuson). As the two approached the car, they were charged by four men. Two of the men grabbed Kaai, held her at gunpoint, and attempted to force her to open the restaurant. When Magnuson ran to seek help, the other two men briefly chased him before fleeing from the scene on foot. After witnesses near the Parkside Cafe intervened on Kaai's behalf, the remaining two robbers released her and fled. Shortly thereafter, Roger Young a/k/a Roy Young was arrested nearby with Kaai's necklace in his possession. The other robbers were not apprehended.

On the night before Roy Young's robbery and habitual criminal trial was scheduled to commence, Magnuson's roommate, Steven Curtis (Curtis) returned home accompanied by a friend, Dan Smith (Smith). Just after Curtis and Smith entered the house, two men ran upstairs from the basement. Evidence established that the shorter of the two men was the defendant, Kevin Fears, and that the other man was Joe Young, the younger brother of Roy Young.

Defendant pointed a gun at Curtis and pulled the trigger. The gun failed to fire. Defendant and Joe Young then directed Curtis and Smith to lie on the floor and repeatedly demanded to know which man was "Frank." When Curtis and Smith explained that "Frank" was not there, the two gunmen demanded to see identification. Defendant and Joe Young held Curtis and Smith captive while they waited for Frank Magnuson to return.

As Curtis and Smith lay on the floor, Curtis heard Joe Young speaking on the telephone. Curtis heard Young tell the person to whom he was speaking that they were going to have to "pop them." Shortly thereafter, defendant shot both Smith and Curtis. Though Curtis was shot in the head and the arm, he pretended to be dead and survived. Smith was shot twice in the head and died. As the gunmen were leaving, Curtis heard Frank Magnuson enter the house and then heard numerous gunshots. Curtis waited until the gunmen were gone, discovered that Smith and Magnuson were both dead, and called 911.

At trial, Roy Young's wife, Christa Schaeffer–Young (Schaeffer–Young), testified that defendant and Joe Young murdered Frank Magnuson so that he could not testify against Roy Young regarding the robbery at the Parkside Cafe. Schaeffer–Young testified that, some time before the murders, defendant told her that he would try to make the witnesses to that case "not testify."

Schaeffer–Young detailed how she obtained Magnuson's telephone number by reviewing discovery documents from Roy Young's case and, a few days before Young's trial, called Magnuson to ask him not to testify. When Magnuson told her he could identify Roy Young as one of the robbers and would testify at the trial, Schaeffer–Young passed the information on to Roy Young who was in custody awaiting trial.

Schaeffer–Young's testimony was that, two days before the murders, she participated in a four-way phone conversation with defendant and the Young brothers. She listened as Roy Young told the other two men to wear rubber gloves under their regular gloves "so the powder burns don't show up." Later that day, defendant called her and complained that Roy had waited so long that "it was going to be sloppy."

Schaeffer–Young testified that she received a phone call from Joe Young on the night of the murders. Young asked if she knew what Frank Magnuson looked like and told her that "they" had been there for a while with two other guys but that "Frank" had not yet showed up. After Joe Young told her they were going to "pop" the two men, she heard a man in the background

pleading for his life and heard defendant's voice threatening to shoot the men.

Schaeffer–Young also said that, several hours later, she received another phone call from Joe Young in which he told her that they had killed three men at the house, one of whom was Magnuson. Schaeffer–Young's testimony about her phone conversations with Joe Young was corroborated by evidence showing that a key which fit the lock to Joe Young's residence was found the day after the murders in the house shared by Magnuson and Curtis.

Police officers testified that they responded to the scene of the murders and made plaster casts of shoe impressions found outside the window which the gunmen used to gain entry. A representative from the company which manufactured the shoes Fears allegedly wore stated that each shoe had a unique sole pattern. An expert witness in the field of footwear impression evidence testified that it was "highly probable" that the impressions found at the scene were made by the pair of shoes taken from defendant when he was arrested.

Curtis viewed defendant's shoes along with several other pairs of shoes in a shoe lineup. Curtis testified that defendant's shoes might have been worn by the shorter of the two gunmen.

Prior to defendant's trial in this case, one of the four Parkside robbers came forward and, in exchange for immunity, agreed to testify. The robber, Derek Everett, testified that he committed the robbery with Roy Young, Joe Young, and defendant, Kevin Fears.

Defendant was convicted of all charges by a jury which declined to impose the death penalty. Defendant was sentenced to two consecutive life sentences and additional consecutive sentences totalling 144 years.

Details of the investigation which led to defendant's arrest, the procedural history of the case, and other relevant facts are set out in this opinion.

## I.

### Statutory Speedy Trial

Defendant first argues that the trial court erred in denying his motion to dismiss the charges because of a violation of his statutory right to a speedy trial. Section 18–1–405, C.R.S. (1986 Repl.Vol. 8B). More specifically, defendant contends that the speedy trial period was not tolled during the time required for the supreme court to review the trial court's ruling that Colorado's death penalty statute was unconstitutional. We disagree.

Defendant pled not guilty to the charges in this case on February 1, 1990, and a jury trial was scheduled for June 11, 1990. On May 9, 1990, the district court ruled that Colorado's death penalty statute, as amended in 1988, was unconstitutional. On that same date, the prosecution filed a notice of appeal in the supreme court. The prosecution's notice of appeal denominated the appeal as an interlocutory appeal pursuant to § 16–12–102(1), C.R.S. (1986 Repl.Vol. 8A).

In *People v. Young,* 814 P.2d 834, 836 (Colo.1991), the supreme court held that: "[S]ection 16–12–102(1) does not authorize [the prosecution's] appeal but ... we can and should exercise our original jurisdiction under C.A.R. 21 to review the district court's ruling invalidating Colorado's death penalty sentencing statute." In reaching that conclusion, the supreme court first held that "a pretrial ruling that the death penalty statute violates the Colorado Constitution [is not] a 'final judgment' for the purposes of appeal under subsection 16–12–102(1)" and that the section therefore was not a "source of ... jurisdiction to review the district court's interlocutory ruling...." *People v. Young, supra,* 814 P.2d at 838.

Notwithstanding that conclusion, the supreme court went on to suspend the rules of appellate procedure pursuant to C.A.R. 2 and to exercise original jurisdiction to review the district court's ruling under C.A.R. 21. The supreme court concluded that, if it did not exercise such jurisdiction, a direct appeal would be an inadequate remedy "because the prosecution will be foreclosed from seeking the death penalty in this case even if the district court's ruling were to be later overturned on appeal." *People v. Young, supra,* 814 P.2d at 839.

The supreme court then addressed the merits of the district court's ruling and held that, as amended in 1988, the death penalty statute was unconstitutional under the Colorado Constitution. The supreme court's opinion, as modified on denial of the prosecution's petition for rehearing, was issued on July 29, 1991. *People v. Young, supra.*

After a second original proceeding in the supreme court, which we consider in Part II in addressing the defendant's claim of a denial of the constitutional right to a speedy trial, the district court denied defendant's motion to dismiss the charges for violation of his statutory right to a speedy trial. The court reasoned that the supreme court's ruling in *People v. Young, supra,* was a "redenomination" of the prosecution's appeal such that the statutory speedy trial period was tolled because jurisdiction was ultimately accepted in the supreme court.

Section 18–1–405(1), C.R.S. (1986 Repl.Vol. 8B) provides that: "[I]f a defendant is not brought to trial on the issues raised by the complaint, information, or indictment within six months from the date of the entry of a plea of not guilty, ... the pending charges shall be dismissed." The statute also states that: "In computing the time within which a defendant shall be brought to trial as provided in subsection (1) of this section ... [t]he period of delay caused by an interlocutory appeal whether commenced by the defendant or by the prosecution" shall be excluded. Section 18–1–405(6)(b), C.R.S. (1996 Cum. Supp.).

Original proceedings under C.A.R. 21 are interlocutory in nature and qualify for the interlocutory appeal time exclusion contained in § 18–1–405(6)(b). *People v. Ferguson,* 653 P.2d 725 (Colo.1982); *People v. Medina,* 40 Colo.App. 490, 583 P.2d 293 (1978).

Relying on *People v. Gallegos,* 926 P.2d 156 (Colo.App.1996) (*cert. granted,* Nov. 12, 1996), defendant argues that the period during which an improperly filed interlocutory appeal is pending is not excludable from the statutory speedy trial period. In our view, *Gallegos* is not on point and is readily distinguishable because the interlocutory appeal at issue in that case was filed in this court and was unauthorized by statute or rule. The division in *Gallegos* concluded that there was no statute or rule which permitted an "interlocutory" appeal of a trial court's ruling dismissing two counts of a multi-count information for lack of probable cause. Accordingly, the appeal was not "interlocutory" for purposes of tolling the speedy trial statute. Employing an alternative analysis, the division in *Gallegos* concluded that the limited jurisdiction of this court did not authorize determination of the prosecution's "interlocutory" appeal and that any delay occasioned by an appeal to an appellate court that lacked jurisdiction is not to be excluded from the computation of the statutory speedy trial period in § 18–1–405(6)(b).

By contrast, the interlocutory appeal filed in *People v. Young, supra,* was ultimately reviewed as an original proceeding. Since the supreme court suspended the appellate rules and accepted jurisdiction over the cause as an original proceeding pursuant to C.A.R. 21, jurisdiction existed in that court. Therefore, the statutory speedy trial period was tolled.

We reject defendant's claim that the speedy trial period could not have been tolled because a stay of proceedings was not issued while *People v. Young, supra,* was pending. In *People v. Ferguson, supra,* the supreme court held that an original proceeding under C.A.R. 21 brought in "good faith" tolled the statutory speedy trial period even though § 18–1–405(6)(b) did not specifically refer to original proceedings. In reaching that conclusion, the supreme court stated that "the intent of the legislature is better served by interpreting the language in the broader sense." *People v. Ferguson, supra,* 653 P.2d at 727.

Nothing in the language of § 18–1–405(6)(b) or the reasoning of *Ferguson* suggests that a stay of the trial court proceedings must be issued for an original proceeding in the supreme court to toll the speedy trial period. As interpreted in *Ferguson,* § 18–1–405(6)(b) tolls the speedy trial period for the "period of delay caused" by an original proceeding. While a stay of proceedings is the most obvious way in which an original proceeding can "cause" a defendant's trial to

be delayed, *People v. Young, supra*, reveals that it is not the exclusive means. *See also People v. Warner*, 930 P.2d 564, 571 n. 15 (Colo.1996) (if the prosecution's appeal of a final judgment is not interlocutory, then a stay of proceedings may be an alternative means of tolling the statutory speedy trial period).

In *People v. Young, supra*, the supreme court held that the prosecution was entitled to have a supreme court determination of whether the 1988 amendments to the death penalty statute were constitutional before defendant's trial commenced. Hence, as a practical matter, the original proceeding "caused" the delay which occurred while the matter was pending in the supreme court.

We would reach the same conclusion under the supreme court's recent decision in *People v. Warner, supra*. In *Warner*, the supreme court held that the prosecution's appeal of a trial court's order dismissing some counts of a multi-count information tolled the statutory speedy trial period without deciding whether the appeal was interlocutory in nature.

The trial court in *Warner* dismissed several general felony offenses on the ground that prosecution was barred because the charged conduct was criminalized by more specific misdemeanor provisions of the Limited Gaming Act. The prosecution filed an appeal in this court pursuant to § 16–12–102(1), which was referred to the supreme court for a determination of jurisdiction under § 13–4–110(1)(a), C.R.S. (1987 Repl.Vol. 6A). The supreme court accepted jurisdiction and affirmed the trial court's dismissal of some of the charges. However, without deciding whether the prosecution's appeal was "interlocutory," the supreme court accepted the "equitable notion" that, because the prosecution was entitled to an opportunity to test the trial court's ruling on appeal without forgoing prosecution of the remaining charges, the statutory speedy trial period was tolled. *People v. Warner, supra*, 930 P.2d at 570–71.

Under the pragmatic analysis of *Warner*, it is evident that the amount of time required for the prosecution here to obtain appellate review of the trial court's ruling declaring the death penalty statute unconstitutional is not chargeable to the six-month speedy trial period.

For the foregoing reasons, we conclude that the six-month speedy trial period was tolled during the pendency of *People v. Young, supra*.

## II.

### *Constitutional Speedy Trial*

Defendant asserts that his speedy trial rights under the Sixth Amendment and Colo. Const. art. II, § 16, were violated because, in addition to the period of delay caused by the original proceeding, a second period of delay was occasioned by a subsequent original proceeding in *People v. District Court*, 834 P.2d 242 (Colo.1992). We are not persuaded.

### A.

On August 5, 1991, a week after the supreme court issued its modified opinion in *People v. Young, supra*, the prosecution filed a notice of intent to seek the death penalty under the death penalty statute as it existed prior to the 1988 amendments. On August 15, 1991, the trial court rejected the prosecution's argument that the pre–1988 statute was revived. The prosecution filed an original proceeding in the supreme court and, on August 30, 1991, the supreme court issued an order to show cause and stayed the proceedings. The supreme court discharged that rule and issued its opinion in *People v. District Court, supra*, on June 29, 1992.

In September 1992, the trial court heard argument on the defendant's motion to dismiss for violation of speedy trial rights filed in July 1991. Defendant made the statutory speedy trial argument addressed in the preceding section of this opinion. Although defendant did not make a separate constitutional speedy trial argument, he did challenge the length of delay caused by the second original proceeding. The trial court ruled that § 18–1–405(6)(h), C.R.S. (1996 Cum. Supp.), required that the defendant be brought to trial within three months of the date the supreme court issued its mandate in *People v. District Court, supra*.

In October 1992, the trial court ruled that the supreme court's ruling in *People v. District Court*, 834 P.2d 181 (Colo.1992) permitted the prosecution to seek the death penalty. In the defendant's case, the retroactive application of the 1991 saving legislation prevented the unconstitutional 1988 amendments from creating a gap in the availability of the death penalty.

Defendant's first trial commenced on November 2, 1992, but resulted in a mistrial on November 17, 1992. The trial that resulted in the present convictions began on January 7, 1993.

### B.

The constitutional right to a speedy trial attaches with the filing of a formal charge. Under both the United States and Colorado Constitutions, whether a defendant's right to a speedy trial has been violated is determined by application of a four-factor ad hoc balancing test. The four factors are: the length of delay, the reason for the delay, the defendant's assertion or demand for a speedy trial, and prejudice to the defendant. The burden is on the defendant to prove that he or she has been denied a speedy trial and all relevant facts are to be considered. *People v. Chavez*, 779 P.2d 375 (Colo.1989).

Here, the length of time from the date defendant was charged until the commencement of his first trial was three years and four months. The period of delay caused by the two original proceedings in the supreme court was approximately two years.

While a delay of this length is significant, it is not determinative of whether defendant's rights to a speedy trial were violated. *See People v. Small*, 631 P.2d 148 (Colo.1981), *cert. denied*, 454 U.S. 1101, 102 S.Ct. 678, 70 L.Ed.2d 644 (1981) (a delay of over four years did not violate defendant's constitutional rights to a speedy trial).

With respect to the reason for the delay, we conclude that both original proceedings in the supreme court were filed in a legitimate effort to clarify the constitutional status of Colorado's death penalty statute, and, contrary to defendant's assertion, the fact that the trial court's rulings were sustained does not show that the original proceedings were a "manipulation of the appellate process."

In the first original proceeding in which the supreme court upheld the trial court's ruling declaring the 1988 amendments to the death penalty unconstitutional, three justices dissented from the plurality opinion. *See People v. Young, supra*, (Rovira, C.J., Erickson, and Vollack, JJ., dissenting). Similarly, although the supreme court upheld the trial court's ruling that the pre–1988 statute was not revived by the ruling in *Young*, two justices dissented from that decision. *See People v. District Court*, 834 P.2d 242 (Colo. 1992) (Kirshbaum and Vollack, JJ., dissenting). In light of the divided opinions of the supreme court, it cannot be seriously suggested that the prosecution sought relief in bad faith. Further, we reject defendant's argument that the prosecution was obligated to anticipate the *Young* decision and present its revival argument in that proceeding.

As to the third factor, defendant asserted his statutory rights to a speedy trial in the trial court. Although defendant's motion alleged that he had been denied his constitutional rights to a speedy trial, he made no separate argument in support of that claim. Thus, while the constitutional claim was presented, it was not pursued.

Regarding prejudice, defendant first argues that the pre-trial delay enabled the prosecution to obtain the testimony of Everett as a witness concerning the robbery at the Parkside Cafe. However, the record reflects that Everett first disclosed his involvement in the robbery to the District Attorney on June 5, 1990, six days before defendant was first scheduled for trial (and within the original six-month speedy trial period). Thus, his availability as a witness is not a result of the defendant's claim of prejudicial delay.

Defendant also alleges that the prosecution unfairly benefitted from the pre-trial delay because, during the intervening period, the General Assembly enacted the legislation which allowed the prosecution to seek the death penalty in accordance with *People v. District Court*, 834 P.2d 181 (Colo.1992).

However, in permitting retroactive application of the saving legislation, the supreme court in *People v. District Court, supra,* held that persons committing first degree murder prior to the date the *Young* decision was announced were on notice that death was a possible penalty. Moreover, the jury's decision not to impose the death penalty significantly undermines defendant's claim that he was prejudiced.

Considering these four factors, we conclude that defendant's constitutional right to a speedy trial was not violated in this case.

## III.

### Evidence of the Robbery at the Parkside Cafe

■ Defendant claims that the trial court erred by admitting evidence of the robbery at the Parkside Cafe as other act evidence without making a pre-trial determination of whether the prosecution had established by a preponderance of the evidence that he participated in that crime. Defendant also contends the court erred by not allowing him to present evidence or make an offer of proof rebutting the prosecution's pre-trial evidence. We perceive no error.

■ Because the robbery at the Parkside Cafe was *res gestae* evidence, no pre-trial finding was required. Evidence of other criminal conduct intertwined with the crime charged is considered part of the *res gestae* of that offense, and the trial court is not subject to the procedural requirements pertaining to other act evidence admitted pursuant to CRE 404(b). *People v. Czemerynski,* 786 P.2d 1100 (Colo.1990).

■ *Res gestae* evidence generally " 'forms an integral and natural part of an account of the crime....' " *People v. Quintana,* 882 P.2d 1366, 1373 (Colo.1994). Such evidence provides the fact-finder with a full and complete understanding of the events surrounding the crime and the context in which the charged crime occurred, and is admissible if it is relevant and if its probative value is not substantially outweighed by the unfair prejudice to the defendant. *People v. Czemerynski, supra.*

Here, it is impossible to separate defendant's participation in the robbery at the Parkside Cafe from his convictions by a jury of the two murders and attempted murder. Without a contextual understanding of why Frank Magnuson was a target, the jury would be left with the false impression that the killings in this case were simply random acts of violence. Although the two events were somewhat remote in time, they were inextricably intertwined in such a way that evidence of defendant's participation in the robbery at the Parkside Cafe was admissible as *res gestae* evidence, and was part of the criminal episode.

## IV.

### Cross–Examination of Everett

Defendant also claims the trial court erred by not allowing him to cross-examine Everett concerning plea agreements Everett had negotiated prior to the date of the robbery at the Parkside Cafe. Again, we disagree.

■ A criminal defendant has a constitutional right to cross-examine an adverse witness concerning any immunity granted in exchange for the witness' testimony. This right of confrontation extends to pending or threatened charges for which the witness may hope or expect to receive lenient treatment in exchange for testimony against the defendant. *Merritt v. People,* 842 P.2d 162 (Colo.1992).

■ Here, the trial court's decision to restrict cross-examination concerning Everett's 1984 and 1987 felony convictions did not violate defendant's rights of confrontation.

Although defendant was permitted to establish the existence of those convictions, he asserts that he should have been allowed to disclose the underlying plea agreements in order to prove that Everett was experienced in plea bargaining across jurisdictions, *i.e.,* pleading guilty in one jurisdiction as a means of causing charges in another jurisdiction to be dismissed or otherwise resolved.

We are satisfied that defendant's right of confrontation was protected by the wide latitude he was allowed in cross-examining Everett regarding the grant of immunity he

received for the robbery at the Parkside Cafe as well as all charge and sentence concessions conferred in other jurisdictions as a result of his testimony against defendant. In our view, the court acted within its discretion in ruling that evidence of plea agreements Everett entered into before committing the robbery at the Parkside Cafe was not relevant. *Merritt v. People, supra.*

## V.

### Denial of Defendant's Motion for a Mistrial

■ Defendant contends the trial court abused its discretion by not declaring a mistrial after a witness inadvertently disclosed that there had been an earlier trial. We are not persuaded.

In cross-examining Curtis, defense counsel asked a series of questions concerning the statement he had given to the police describing the shoes worn by one of the gunmen. In the course of explaining that the police officer had inaccurately recorded his statement, Curtis mentioned that he had brought the discrepancy to the attention of the prosecutors "before the last hearing, the last trial."

Defendant moved for a mistrial, arguing that he had been irremediably prejudiced by Curtis' reference to the previous trial. Defendant argued that the testimony was especially prejudicial because the jury would likely assume the prior trial concerned the robbery at the Parkside Cafe.

The court denied defendant's motion based on findings that Curtis' inadvertent reference to the prior trial was brief and that any prejudice to defendant could be eliminated by means of a cautionary instruction. The trial court also denied defendant's request that the jurors be individually questioned.

Immediately thereafter, the court instructed the jury that there "was a prior trial on the exact same allegations against" defendant. The court told the jury that the earlier trial was terminated prior to deliberations after excusal of jurors resulted in an insufficient number of remaining jurors. The court emphasized that the trial was terminated for reasons that were not the fault of defendant

or his counsel. The court admonished the jurors not to allow knowledge of the prior trial and mistrial to prejudice their consideration of the evidence.

■ A trial court has broad discretion in deciding whether to grant or deny a mistrial, and its decision will not be disturbed on appeal absent a gross abuse of that discretion and prejudice to the defendant. A mistrial is a drastic remedy and is only warranted if the prejudice to the defendant cannot be remedied by other means. *People v. Abbott,* 690 P.2d 1263 (Colo.1984).

Here, any possibility of prejudice resulting from Curtis' passing reference to the prior trial was prevented by the court's comprehensive corrective instruction. Significantly, this is not a case in which the jury learned of a previous conviction for the same charges. *See, e.g., Salas v. People,* 177 Colo. 264, 493 P.2d 1356 (1972). Accordingly, we conclude the trial court did not abuse its discretion in denying defendant's motion for a mistrial. Likewise, we conclude the court's decision not to poll the jurors was a proper exercise of discretion. *See People v. Horton,* 683 P.2d 358 (Colo.App.1984).

## VI.

### Probable Cause for Defendant's Arrest

■ Defendant has appealed the denial of his motion to suppress evidence obtained as a result of his allegedly unlawful arrest. We agree with the trial court's conclusion that police officers had probable cause to arrest defendant without a warrant.

■ It is the prosecution's burden to establish the existence of probable cause to support a warrantless arrest. Probable cause to arrest exists when the objective facts and circumstances available to a reasonably cautious officer warrant the belief that an offense has been or is being committed by the person arrested. The probable cause standard is a practical, nontechnical standard and is to be measured by reasonableness, not mathematical probability. *People v. McCoy,* 870 P.2d 1231 (Colo.1994).

■ "[P]robable cause may be established by hearsay information," *People v. Henry*, 631 P.2d 1122, 1126 (Colo.1981), and "[a]n officer who does not personally possess sufficient information to constitute probable cause may nevertheless make a valid arrest if he acts upon the direction or as a result of a communication from a fellow officer, and the police, as a whole, possess sufficient information to constitute probable cause." *People v. Freeman*, 668 P.2d 1371, 1377 (Colo.1983).

■ In reviewing a trial court's denial of a motion to suppress, an appellate court must defer to the trial court's findings of historical fact. So long as the trial court's factual findings are supported by competent evidence in the record, they will not be disturbed on appeal. *See People v. Rosales*, 911 P.2d 644 (Colo.App.1995); *People v. Walter*, 890 P.2d 240 (Colo.App.1994).

Here, the record supports the trial court's findings that, at the time of defendant's arrest ten days after the murders, the following information was known to the police. According to Curtis, the attack was committed by two men, one of whom did the shooting. That information was consistent with the statement of one of Roy Young's brothers, Chris Young, who told a friend that he and "Kevin" did the killings and that "Kevin" did the actual shooting. Chris Young's friend provided this information to the police and explained that he knew defendant was the "Kevin" to whom Chris Young had been referring. The informant told the police he had encountered defendant at Chris Young's house on several occasions when defendant was accompanied by Roy Young. He also selected defendant's photograph from an array.

The police officers had reason to believe Chris Young's self-incriminating statements. The officers had learned that, while incarcerated awaiting trial for the robbery at the Parkside Cafe, Roy Young had told a fellow inmate about his pending robbery case. In an interview with police, the inmate reported that Roy Young had told him that members of his family were "hit men" who were going to "take care" of the witness who could identify him.

The record further establishes that the police officers knew that, six months earlier, defendant had been arrested for committing a robbery with Joe Young.

In addition to the evidence connecting defendant to the Young brothers, police officers had information tying defendant's vehicle to the murders. One of Curtis' neighbors contacted police and reported that, a few months before the murders occurred, a man had knocked on her door late one evening. When she answered the door, the man apologized and said he must have the wrong address. She watched as the man returned to the alley and got into a "red or brown" 1970's model Cadillac in which another man was seated. At the time of his arrest, defendant was driving a red 1979 Cadillac registered in his own name.

Considered as a whole, the facts known to the officers: (1) connected Roy Young and his brothers to the murders; (2) connected defendant to Roy Young; (3) connected defendant to Joe Young through the commission of a crime; (4) and connected a car similar to defendant's with suspicious activities near the scene of the crime. All of these facts were brought together in a cohesive manner by the self-inculpatory statement of Chris Young.

Although police investigation conducted after defendant's arrest revealed that it was Joe Young, and not Chris Young, who committed the crimes with defendant, that discovery is irrelevant to an assessment of the information known to police prior to defendant's arrest. *See People v. Woods*, 175 Colo. 34, 485 P.2d 491 (1971) (in assessing probable cause, hindsight will not be used to discount information obtained from an informant which is subsequently proven to be incorrect unless it is shown that police officers knew the information to be false).

At the time it was made, Chris Young's inculpatory statement was presumptively reliable because it was a self-incriminating statement unmotivated by any apparent self-interest. *See People v. Turcotte–Schaeffer*, 843 P.2d 658 (Colo.1993); *People v. Henry*, *supra*. And, like the inmate's statement concerning Roy Young's statements, Chris Young's statements were conveyed to police

by a third party who reported the information in person, not anonymously.

Under the totality of the circumstances, we conclude the officers possessed probable cause for defendant's arrest.

## VII.

### Denial of Defendant's Mid–Trial Motion to Replace a Juror

■■■ Defendant claims that the trial court erred by denying his mid-trial motion to remove a juror who was exposed to inaccurate extra-judicial information concerning the reason that a mistrial had been declared in defendant's first trial. Because of the corrective action taken by the court and the juror's assurances of continued impartiality, we perceive no abuse of discretion in the trial court's denial of defendant's motion.

■■■■■ For improper communication between a juror and a third party to warrant reversal of a criminal conviction, actual prejudice must be shown and will not be presumed. It is within the sound discretion of the trial court to determine whether prejudice resulted from an improper communication with a juror, and its decision will not be overturned on appeal absent a clear abuse of that discretion. *People v. Hickam,* 684 P.2d 228 (Colo.1984).

Here, one of the jurors contacted the court during the trial and asked to discuss a matter outside the presence of the other jurors. The juror informed the court that, on two separate occasions during the preceding weekend, acquaintances had told him that a mistrial had been declared in defendant's first trial because the jurors had been threatened and intimidated. The juror indicated that, on both occasions, he had explained that he could not discuss defendant's trial. In describing the incidents to the court, the juror stated that he did not regard the information as reliable and had not disclosed the information to his fellow jurors. The juror also assured the court that it would not affect his impartiality.

As indicated in Part V above, the court had already told the entire jury that the mistrial was not defendant's fault. The court further advised this juror that there was no truth to the allegations and that defendant was not in any way involved in threatening or intimidating jurors in the previous trial. During extensive questioning by defense counsel, the juror repeatedly affirmed his ability to ignore the information and render an impartial verdict.

Defendant moved to disqualify the juror for cause. The court denied the motion, finding that the juror's "comments, demeanor, and assurances more than demonstrate his ability to follow the law and decide the case solely upon the evidence that's presented."

As an additional precautionary measure, the court recalled the juror and informed him that the reason a mistrial was declared in the first trial was that one of the jurors had taken a romantic interest in one of the other jurors and, after those jurors were excused, an insufficient number remained. The court emphasized that no jurors were threatened or intimidated and that the mistrial was not defendant's fault. Once again, the juror assured the court he could be a fair juror. The court directed the juror not to disclose any aspect of the *in camera* discussions to the other jurors.

The trial court was in the best position to view the juror's demeanor and assess whether the juror could be impartial. *See People v. Christopher,* 896 P.2d 876 (Colo.1995). Based on our review of the record, we are satisfied that the trial court acted within its discretion in denying defendant's motion to excuse the juror for cause.

## VIII.

### Expert Testimony Regarding Shoe Print Identification

■■■ We also reject defendant's contention that the trial court erred in admitting the testimony of an expert witness in the field of shoe print impression examination and identification.

In *People v. Perryman,* 859 P.2d 263 (Colo. App.1993), a division of this court held that the admissibility of expert testimony comparing the characteristics of the defendant's

shoes to shoe prints found near the scene of the crime and the victim's body was not governed by the standard set forth in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923). Noting that the expert's comparative process involved no "manipulation" of physical evidence, the court in *Perryman* determined that an understanding of the expert's techniques was readily accessible to the jury and not dependent upon familiarity with highly technical or obscure scientific theories. Accordingly, the court in *Perryman* held that admission of such evidence was governed by the less restrictive test of CRE 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

We find the reasoning of *Perryman* to be persuasive and follow it in this case.

■ Admission of expert testimony pursuant to CRE 702 is governed by a two-part balancing test. First, in assessing whether the expert testimony will assist the jury, the trial court must determine the reliability of the scientific principles upon which the expert testimony rests. Second, the court must measure the likelihood that the testimony will overwhelm or mislead the jury. *Campbell v. People,* 814 P.2d 1 (Colo.1991).

■ Whether a sufficient foundation has been laid for the admission of evidence is a matter within the sound discretion of the trial court, and its ruling will not be disturbed absent a clear abuse of that discretion. And, a trial court's decision to admit expert testimony pursuant to CRE 702 will not be overruled on appeal unless the ruling is manifestly erroneous. *People v. Perryman, supra.*

In this case, the expert witness was an F.B.I. agent with over twenty years of experience as an examiner of footwear impression evidence. He had taught a course in footwear impression evidence at the F.B.I. academy for ten years and had published a book on the subject. He had previously been qualified as an expert witness in the field over 100 times.

The witness detailed how he compared the features of defendant's shoes to the casts taken from the impressions found at the crime scene. He explained that the shoes worn by defendant had herringbone tread and wear patterns which both corresponded with features of the casts. The representative from the company which manufactured defendant's shoes explained to the expert why each shoe had a unique sole pattern.

There was little possibility that the expert's testimony would mislead the jury. As in *Perryman,* the reliability of the expert witness' comparative processes and techniques was readily understandable to the jury because it was not dependent upon scientific manipulation of evidence. In opining that it was "highly probable" that defendant's shoes made the impressions, the expert explained that he based that assessment on observable factors. And, contrary to defendant's suggestion, the expert witness throughout his testimony made clear how he relied on his considerable experience in order to make the comparison in a structured manner.

Accordingly, we conclude the trial court acted within its discretion in allowing the expert witness' testimony.

## IX.

### Rebuttal Argument

Without specifying the allegedly offending remarks, defendant maintains that the prosecutor committed reversible error in rebuttal closing argument by commenting on defendant's right to remain silent, attacking defense counsel's integrity, and vouching for the credibility of prosecution witnesses. In a related argument, defendant contends the trial court abused its discretion by denying his motion for a mistrial. We are not persuaded.

■ On two occasions during rebuttal argument, defendant objected on the ground that the prosecutor was commenting on his decision not to testify. However, the record reflects only ambiguous remarks not directly

referring to defendant's decision not to testify. *See People v. Lawson,* 37 Colo.App. 442, 551 P.2d 206 (1976). We conclude the trial court took adequate steps to prevent any prejudice by admonishing the prosecutor to make clear that he was responding to defendant's closing argument and by instructing the jury to consider the remarks in that context. *See People v. Carrier,* 791 P.2d 1204 (Colo.App.1990).

Our review of the record reveals that, although the prosecutor occasionally spoke in the first person singular, he did not "vouch" for the credibility of witnesses. Moreover, when defendant objected, the prosecutor appropriately rephrased his argument.

Defendant made several objections on the ground that the prosecutor was attacking the manner in which defense counsel had defended the case. We agree with the trial court's determination that most of the prosecutor's comments were legitimate responses to defendant's closing argument. *See People v. Vialpando,* 804 P.2d 219 (Colo.App.1990) (a prosecutor is afforded considerable latitude in replying to an argument made by opposing counsel).

Any prejudice from the prosecutor's improper remarks was overcome by the trial court's curative instruction. *See People v. Carrier, supra.*

Accordingly, we perceive no reversible error and conclude the court properly denied defendant's motion for a mistrial. *See People v. Marquantte,* 923 P.2d 180 (Colo.App. 1995).

### X.

#### Cumulative Error

Defendant finally asserts that reversal is required by the cumulative error doctrine. Since we found no error that substantially prejudiced the defendant's right to a fair trial, there is no error to compound. There was no cumulative error in this case. *See People v. Roy,* 723 P.2d 1345 (Colo.1986).

The judgment is affirmed.

RULAND and QUINN**, JJ., concur.

---

** Sitting by assignment of the Chief Justice under provisions of the Colo. Const. art. VI, Sec. 5(3),

and § 24–51–1105, C.R.S. (1996 Cum.Supp.).