24CA0177 Peo v Vernagallo 04-09-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0177
Douglas County District Court No. 21CR736
Honorable Natalie Strickland, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Vincente Tyler Vernagallo,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE SCHUTZ
Brown and Berger*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 9, 2026

---

Philip J. Weiser, Attorney General, Caitlin E. Grant, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, River B. Sedaka, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1     Defendant, Vicente Tyler Vernagallo, appeals the trial court's judgment of conviction entered on a jury verdict finding him guilty of two counts of felony menacing.  We affirm the judgment.

## I.     Background and Procedural History

¶ 2     Prior to the events leading to his convictions, Vernagallo was diagnosed with schizoaffective and bipolar disorders, for which he had been repeatedly hospitalized.  Family members were aware of his condition.

### A.     Incident and Arrest

¶ 3     In August 2021, Vernagallo went to his mother's house carrying an Airsoft[1] carbon dioxide ($CO_2$) powered revolver and its bullets, which contain plastic pellets.  The revolver and bullets closely resemble a real firearm and ammunition.  Prior to arriving at the home, Vernagallo removed the gun's $CO_2$ cartridge,[2] which is required to fire the gun.  Vernagallo went to the garage — a space

---

[1] Airsoft guns are non-lethal replica guns that are used for entertainment, simulated combat training, or competitive target practice.

[2] In order for this Airsoft revolver to fire, the user must insert a $CO_2$ cannister into the bottom of the gun.  Once the cannister is inserted, if the user pulls the trigger pressurized air expels and discharges a bullet.  If the $CO_2$ cannister is not loaded, the gun cannot discharge.

where family and friends often congregated — to visit his sister, Britney Bond, and her boyfriend, Dillon Adame.

¶ 4 Bond testified that, while in the garage, Vernagallo slapped the revolver onto the table, removed the bullets, and then reloaded one bullet into one of the cylinder's chambers. He then spun the cylinder, held the gun to his head, smiled, said "hi," and pulled the trigger. Vernagallo then abruptly pointed the gun at Bond, holding it about five inches from her forehead, and pulled the trigger. The gun did not go off because unbeknownst to Bond and Adame, Vernagallo had removed the $CO_2$ cannister.

¶ 5 Adame, who witnessed Vernagallo pull the trigger, yelled at Bond to run. Bond testified that she was worried about Vernagallo shooting her in the back because she believed that the gun was real. Bond and Adame ran into the driveway and fled down the block. Vernagallo followed in his car and pointed the gun at them through the car window. They ran to a neighbor's house and asked for help. The neighbor called the police.

¶ 6 Shortly after, the police pulled over Vernagallo's car. Approximately five armed officers were present. Vernagallo was ordered to step out of his car. Sergeant Mark Terreault, an officer

2

who backed up the arresting officers, testified that the 911 dispatcher told them that Vernagallo was armed, so they asked him to lift his shirt. Rather than lifting his shirt, Vernagallo took it off.

¶ 7        Officer Brandon Litwiller arrested Vernagallo, handcuffed him, and placed him in the back of his patrol car. Litwiller then read Vernagallo his *Miranda*[3] rights and asked him if he wanted to talk to them. He responded "sir, yes sir" and proceeded to talk to the officers. Vernagallo stated that neither Bond nor Adame knew that the Airsoft gun was not a lethal weapon. He acknowledged pointing the gun at Bond and Adame as a joke and following them down the street because he was "bored" and "thought it would be fun." He also admitted that he pointed the Airsoft gun at Bond and Adame with the intent to scare them. Vernagallo apologized for inconveniencing the officers and for the "joke" he played on Bond and Adame.

¶ 8        Vernagallo was charged with two counts of felony burglary and two counts of felony menacing. The prosecution later dismissed the burglary charges.

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

### B. Competency Issues, Trial, and Conviction

¶ 9    In September 2021, defense counsel moved for a competency evaluation. The court promptly ordered the Department of Human Services to conduct an initial evaluation at the county jail. The next month, the trial court found Vernagallo incompetent to stand trial, but he remained in jail until a bed became available at the Colorado Mental Health Hospital in Pueblo (CMHHIP).[4] In January 2022, Vernagallo was admitted to CMHHIP. In February 2022, Vernagallo was forcibly medicated. That same month, a psychiatrist affiliated with CMHHIP opined that Vernagallo was competent to proceed to trial. The court set a final arraignment for September.

¶ 10    Before the arraignment, defense counsel moved for a second competency evaluation. Two months later, after a second evaluation and opinion from a psychiatrist at CMHHIP, the court

---

[4] The parties use the initialism associated with the Colorado Mental Health Institute at Pueblo (CHMIP) in the briefing, however in September 2022, while this matter was being litigated, the Colorado Department of Human Services announced that CHMIP was renamed to the Colorado Mental Health Hospital in Pueblo (CMHHIP), and we refer to it as such. Colo. Dept. of Human Servs., *Introducing Colorado's new office of Civil and Forensic Mental Health* (2022), https://perma.cc/4YH9-KK3Q.

found Vernagallo competent to stand trial. Vernagallo entered a not guilty plea, and the trial was set for April 2023.

¶ 11 In March 2023, defense counsel filed a third competency motion. In April, the trial court again found him incompetent to stand trial and ordered him to be committed for inpatient restoration. Vernagallo again resisted taking medications designed to restore him to competency. After Vernagallo was forcibly medicated pursuant to a court order, the court again found he was competent and reset the trial for October.

¶ 12 After a two-day trial, the jury found Vernagallo guilty on both menacing counts. The trial court sentenced him to three years of supervised probation.[5]

## II. Speedy Trial Claim

¶ 13 Vernagallo first contends that the trial court violated his constitutional right to a speedy trial and requests that his conviction be vacated. We conclude that the delay, while long —

---

[5] In July 2024, the trial court revoked Vernagallo's probation and sentenced him to two years in the custody of the Department of Corrections, with credit for 594 days of presentence confinement. *See* Doulgas County Case No. 21CR736. The presentence confinement credit included 552 days for the period between his original arrest and his conviction on the menacing charges.

especially in light of the fact that Vernagallo was ultimately convicted of two lower-level felonies and initially sentenced to three years of probation — did not violate his constitutional right to a speedy trial.

### A. Standard of Review and Applicable Law

¶ 14 We review de novo whether a defendant's speedy trial rights have been violated.[6] *People v. Glaser*, 250 P.3d 632, 636 (Colo. App. 2010).

¶ 15 The parties dispute whether Vernagallo's claim was preserved. Vernagallo asserted his speedy trial rights through "kites" sent to the trial court requesting a fast and speedy trial by a jury of his peers. The People argue that the trial court was not obligated to consider Vernagallo's pro se filings because he was represented by counsel. *See People v. Gess*, 250 P.3d 734, 737 (Colo. App. 2010) (a court may ignore a pro se motion filed by a defendant who is represented by counsel). But this rule is relaxed when a defendant's lawyer has not asserted a speedy trial objection, and

---

[6] Vernagallo asserts that the delays violated his constitutional right to a speedy trial but does not argue that his statutory speedy trial rights were violated. *See* § 18-1-405, C.R.S 2025. Therefore, we do not consider that statute.

6

the defendant wishes to do so.  *See People v. Jefferson*, 981 P.2d 613, 614 (Colo. App. 1998) (considering the merits of the defendant's pro se request for a speedy trial made while he was represented by counsel); *see also People v. Bergerud,* 223 P.3d 686, 696-97 (Colo. 2010) (disfavoring denying review of an important constitutional right merely because a defendant does not articulate a concern with legal lexicon).

¶ 16    The United States Constitution and the Colorado Constitution protect a defendant's right to a speedy trial.  U.S. Const. amend. VI; Colo. Const. art. II § 16.  Under both provisions, the right to a speedy trial attaches with the filing of a formal charge.  *Moody v. Corsentino*, 843 P.2d 1355, 1363 (Colo. 1993).  The defendant has the burden to prove that his constitutional right to a speedy trial was violated.  *Id.* (citing *People v. Small*, 631 P.2d 148, 154 (Colo. 1981)).

¶ 17    To determine whether that right was violated, this court must apply the test articulated in *Barker v. Wingo*, 407 U.S. 514, 530 (1972).  *Barker* requires courts to weigh (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right

to a speedy trial; and (4) prejudice to the defendant. *People v. West,* 2019 COA 131, ¶ 11 (citing *Barker,* 407 U.S. at 530).

B.    Analysis

¶ 18    Vernagallo focuses his speedy trial argument on the pretrial delays associated with the competency proceedings. The People respond that the delays caused by the state were justifiable and that Vernagallo contributed to the delays by failing to cooperate with the restoration process. Applying the *Barker* factors, we conclude that Vernagallo's constitutional speedy trial rights were not violated.

1.    Length of the Delay

¶ 19    The length of the delay initially functions as a "triggering mechanism" that requires the court to consider whether the delay length is "presumptively prejudicial." *West,* ¶ 10 (citation omitted). The delay between the date that Vernagallo was charged — which took place in late August 2021 — and the trial — which did not take place until October 2023 — was twenty-six months. Vernagallo contends that the delay on its face is long enough to be presumptively prejudicial, thus meriting further consideration of the *Barker* factors. The People concede, and we agree, that the

8

twenty-six-month period was sufficient to trigger a presumption of delay warranting further consideration of the *Barker* factors. *See People v. Sandoval-Candelaria*, 2014 CO 21, ¶ 36 ("[T]he Supreme Court has noted that courts generally have found delays presumptively prejudicial at least as they approach one year." (citing *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992))).

¶ 20 While conceding that the twenty-six-month delay was presumptively prejudicial, the People argue that the length of delay is not determinative of whether Vernagallo's speedy trial rights were violated. They argue that there is no indication that the court or the prosecution deliberately delayed the trial and that, without evidence to the contrary, Vernagallo has failed to meet his burden to prove that the court or the prosecution violated his speedy trial rights. Relatedly, the People argue that the delays associated with the competency evaluations were not unreasonable, particularly because Vernagallo requested three separate evaluations and was twice found incompetent.

¶ 21 Under the circumstances, which we address more fully in the following analysis of the remaining *Barker* factors, we conclude that the delays were insufficient to justify reversal under *Barker*.

## 2. Reason for the Delay

¶ 22 Both parties acknowledge that the restoration process played a central role in the trial's delay. Indeed, Vernagallo does not meaningfully challenge any of the remaining periods of delay. Where the parties differ is how much of the blame is attributable to the court or the prosecution. *See People v. DeGreat*, 2020 CO 25, ¶ 17 ("It is well-settled law that the burden of compliance with the speedy trial requirement rests with the prosecution and the trial court."). First, on the issue of how much of the delay should be attributed to the prosecution or the court, Vernagallo acknowledges that at least five months of the competency period are attributed to the restoration process, which was lengthened due to Vernagallo's failure to cooperate with treatment. But Vernagallo argues that the remaining nine months of the competency period should be attributed to the state.[7]

---

[7] The People calculate the period associated with the competency evaluations to be seven months rather than nine months. We need to not resolve this question, however, because even if we assume the delay was nine months, it does not materially impact our analysis of the speedy trial issue.

10

¶ 23    Vernagallo's counsel raised competency concerns within a month of when Vernagallo was charged. After a hearing, the trial court found Vernagallo incompetent. He was placed in the custody of Douglas County Jail from October until a bed became available in CMHHIP. The time between the request for a competency evaluation and the initial CMHHIP placement was 140 days.

¶ 24    Defense counsel raised competency for the second time in September 2022. It took sixty-five days for Vernagallo to be found competent.

¶ 25    In April 2023, the third time that defense counsel raised competency concerns, it took fifty-two days for Vernagallo to be evaluated and found incompetent. It was almost another month before he was admitted to CMHHIP for restoration.

¶ 26    As Vernagallo notes, his counsel filed three separate motions for competency evaluations. He does not contest that defense counsel knew or should have known of the substantial delays associated with these requests because of the lack of appropriate state funding for competency evaluations, which was amplified by the nursing crisis resulting from the COVID-19 pandemic. We appreciate that defense counsel was obligated to raise the issue of

competency if they had a reason to know that Vernagallo was incompetent. *See* § 16-8.5-102(b), C.R.S. 2025. But the repeated requests, and Vernagallo's resistance to treatment, made some delay inevitable.

¶ 27 The People argue that the delays should not be attributed to either the court or the prosecution because the competency process is controlled by state employees that neither the court nor prosecution control. Vernagallo responds that the delays should be attributed to the court or the prosecution because this is a legally mandated process and ultimately he should not be deprived of his speedy trial rights due to the action or inaction of state officials. *See Vermont v. Brillon,* 556 U.S. 81, 85 (2009) (stating that the state may be charged with delays associated with a breakdown of the public defender's system while also noting that "delays sought by counsel are ordinarily attributable to the defendants they represent").

¶ 28 But Vernagallo concedes that he is not aware of any authority holding that delays in the competency process must be charged to the prosecution or the court. Even so, we are troubled by the People's argument that incompetency delays should be excluded

from the speedy trial analysis. Ultimately, we do not need to resolve this dispute because, even if we assume that the delays are attributable to the court or the prosecution, the aggregate delay attributable to the competency evaluations was not unreasonable.

¶ 29     The total time attributable to the competency delays, not including delays associated with the restoration process, amounted to 282 days, or approximately nine and a half months of the twenty-six months between the filing of charges and the trial. Vernagallo acknowledges that the balance of the competency delays was based on his refusal to participate in the restoration process, rather than delays in actually completing the evaluations.

¶ 30     We appreciate that Vernagallo struggled while incarcerated; however, those struggles alone are insufficient to meet his burden to prove that the delays were unjustified. Therefore, we cannot say that the reasons for the delay weigh in his favor. *See Small*, 631 P.2d at 154 (the defendant bears the burden of showing that the *Barker* factors establish a violation of his speedy trial rights).

### 3.     Assertion of the Right to a Speedy Trial

¶ 31     While we have concluded that Vernagallo's pro se filings were adequate to preserve his speedy trial claim, we note that these

filings were thread-bare in terms of legal analysis. True, Vernagallo asserted that he was often on lockdown, denied meals and hygiene, and assaulted while awaiting restoration to competency. But these allegations were typically mixed with a plethora of unrelated alleged constitutional violations and past grievances, all of which were devoid of legal analysis or authorities, including any analysis of the *Barker* factors. *See People v. Roberts*, 2013 COA 50, ¶48 (declining to address defendant's speedy trial argument because, among other reasons, he did not address any of the elements of the constitutional right).

¶ 32     And notwithstanding Vernagallo's pro se filings, defense counsel never asserted that Vernagallo's speedy trial rights were being violated. On the contrary, defense counsel filed three separate motions for competency evaluations, and at least one motion for continuance.

¶ 33     Under these circumstances, Vernagallo's undeveloped pro se assertion of his speedy trial rights — while sufficient to preserve his speedy trial claim — do not weigh in favor of finding a speedy trial violation.

4. Prejudice as a Result of the Delay

¶ 34 This factor considers prejudice in the context of the defendant's interests that the constitutional speedy trial rights are designed to protect, including the right to (1) "prevent oppressive pretrial incarceration"; (2) "minimize anxiety and concern of the accused"; and (3) "limit the possibility that the defense will be impaired." *Barker*, 407 U.S. at 532. Of these factors, "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*

¶ 35 Vernagallo asserts that the pretrial incarceration caused him to suffer extreme anxiety, as well as abuse, and that he lacked access to meals and hygiene resources, which exacerbated his mental health struggles. But Vernagallo does not allege that the passage of time prejudiced his preparation or the presentation of his defense — for example, a loss of evidence, witnesses, or his own memory of the events at issue.

¶ 36 The People amplify the absence of any suggestion that the delay compromised Vernagallo's ability to present a factual or legal defense. The People also note that in his subsequent re-sentencing,

15

the court credited him for time served while he was in pretrial confinement.

¶ 37     Considering the four *Barker* factors in the aggregate, we conclude that the trial court did not violate Vernagallo's speedy trial rights.  *See People v. Curren*, 2014 COA 59M, ¶ 40 (two-year delay did not violate defendant's federal or state speedy trial rights); *People v. Fears*, 962 P.2d 272, 279 (Colo. App. 1997) (delay of three years and four months did not violate defendant's speedy trial rights).

## III.     *Miranda* Claim

¶ 38     Vernagallo next contends that the trial court reversibly erred by denying his motion to suppress because he did not knowingly waive his *Miranda* rights.  We disagree.

### A.     Additional Facts

¶ 39     Defense counsel moved to suppress the statements Vernagallo made to police officers in the back of the police car on the basis that he could not have knowingly waived his *Miranda* rights due to the severity of his mental illness.  The trial court set the matter for a hearing, where it heard testimony from Sergeant Terreault and Officer Litwiller.

¶ 40    Terreault, who responded to the 911 call, testified that officers treated the initial contact with Vernagallo as a high-risk stop due to the indication that he was armed with a weapon. As a result, approximately five officers were present at the time of arrest, and they had their weapons drawn. Terreault — one of the officers providing backup — testified that he observed Vernagallo responding appropriately to the commands that other officers gave him and that Vernagallo did not demonstrate any concerning responses. He also testified that there was a note in the 911 call that Vernagallo had mental health issues, but the note lacked any diagnosis and did not indicate that there were limitations associated with the mental illness.

¶ 41    Officer Litwiller — who questioned, handcuffed, and arrested Vernagallo — testified that Vernagallo responded appropriately to his commands and understood the questions that he was being asked. Litwiller stated that while Vernagallo was handcuffed inside of the patrol vehicle, he and the other questioning officer did not have their weapons drawn. He also testified that he spoke to Vernagallo for a "couple of minutes" after Vernagallo was placed in the car and that Vernagallo seemed relaxed prior to the *Miranda*

advisement and gave responses indicating that he understood the questions.

¶ 42    Defense counsel argued that Vernagallo's unkempt and sweaty appearance, his casual tone, the removal of his shirt (which he did not put back on), and the later finding that he was incompetent to stand trial, together suggests that he was not fully capable of understanding the circumstances he was facing and the consequences of incriminating himself.

¶ 43    The prosecutor responded that an evaluation to determine competency focuses on a particular time and is driven by different considerations than those used to determine whether a defendant understood and knowingly waived his *Miranda* rights.  The prosecutor urged the court to review the body camera (bodycam) footage of the advisement, waiver, and resulting interrogation, arguing that the footage provided "compelling evidence" that Vernagallo understood his *Miranda* rights.  Moreover, the prosecutor argued that a defendant's mental health history is a relevant, but not dispositive, factor when evaluating whether a defendant's waiver was knowing and intelligent under *Miranda. See People v. Kaiser*, 32 P.3d 480, 486 (Colo. 2001) ("A defendant's

mental capacity is important in determining whether [he] made a knowing and intelligent waiver, however it should not be the only, or even the primary, factor in a trial court's analysis."). Given the totality of the circumstances, the prosecutor argued the trial court should find the waiver was knowing, voluntary, and intelligent.

¶ 44 The court denied the suppression motion after making the following findings:

> I will tell you when I read through this over the weekend, I was concerned a bit, but after watching the [bodycam] footage and hearing the defendant's responses, I'm satisfied based on the totality of the circumstances that he did understand the commands, that he responded to the commands appropriately, and that he did knowingly and voluntarily and intelligently waive his right to *Miranda*.
>
> He seemed calm. I don't think that's dispositive. He seemed — his appearance is what his appearance is. That's certainly not dispositive even in combination with the fact that he may have been sweaty or casual to indicate to the officers that he didn't understand commands, that he didn't fully appreciate what was going on. Even with the mental health flag, the officers were both pretty firm in their testimony that he pulled over appropriately, responded appropriately to commands, and understood their commands and responded appropriately.

> So the [c]ourt will find under the totality of circumstances that his *Miranda* [rights were] knowingly, voluntarily, and intelligently waived.

### B. Standard of Review and Applicable Law

¶ 45 Generally, we review a trial court's ruling on a motion to suppress as a mixed question of law and fact. *Gow v. People*, 2019 CO 30, ¶ 13. We defer to the court's factual findings if they are supported by the record but review its legal conclusions de novo. *Id.* If the statements sought to be suppressed are recorded, however, we may independently review the recording. *See People v. Kutlak*, 2016 CO 1, ¶ 13. In such circumstances, we are in the same position as the trial court to weigh the import of the recording, and assuming other material facts are not disputed, our entire review is de novo. *People v. Sellers*, 2022 COA 102, ¶ 9.

¶ 46 Defendants in criminal cases have a constitutional right against self-incrimination. U.S. Const. amend. V; Colo. Const. art. II, § 18; *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *People v. Aguilar-Ramos*, 86 P.3d 397, 400 (Colo. 2004). Under *Miranda*, the prosecution may not use a statement obtained by police during a custodial interrogation in its case-in-chief unless the suspect was

20

advised of, and validly waived, their Fifth Amendment rights. *People v. Alemayehu*, 2021 COA 69, ¶ 73 (citing *People v. Wood*, 135 P.3d 744, 749 (Colo. 2006)).  The prosecution must show by a preponderance of the evidence that the waiver was valid.  *People v. Smiley*, 2023 CO 36, ¶ 15 (citing *Berghuis v. Thompkins*, 560 U.S. 370, 383-84 (2010)).

¶ 47    "A waiver is knowing and intelligent when made with full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it."  *People v. Platt*, 81 P.3d 1060, 1065 (Colo. 2004); *People v. Hopkins*, 774 P.2d 849, 851 (Colo. 1989).

¶ 48    Generally, to determine whether a waiver is knowing voluntary, and intelligent, courts may consider a number of factors:

> (1) the lapse of time between an initial *Miranda* advisement and a subsequent interrogation, (2) the extent to which a suspect has been informed or is aware of the subject matter of the interrogation prior to its commencement, (3) whether the accused or the interrogating officer initiated the interview, (4) whether and to what extent the accused was reminded of his rights prior to the interrogation, (5) the clarity and form of the defendant's acknowledgement and waiver, if any, and (6) the background and experience of the accused in connection with the criminal justice system.

*People v. Humphrey*, 132 P.3d 352, 356 (Colo. App. 2006).

¶ 49    When a defendant's competency is raised, the court may consider additional factors when evaluating whether the *Miranda* waiver was voluntary, including whether the defendant:

- appeared oriented to their surroundings and situation;

- answered questions in a way that was responsive and rational;

- appreciated the seriousness of their predicament, including the possibility of being incarcerated;

- attempted to deceive the police;

- expressed remorse for their conduct; and

- expressly stated that they understood their rights.

*Platt*, 81 P.3d at 1066.

### C.    Analysis

¶ 50    Vernagallo argues that the trial court erroneously found that he knowingly waived his *Miranda* rights because under the *Platt* factors, he appeared disassociated from the circumstances and did not understand the severity of the situation.  Vernagallo points to the fact that he never placed his shirt back on and appeared to be sweating — presumably manifesting some degree of anxiety while at

22

the same time his affect was calm. Vernagallo also amplifies the subsequent evaluation that found him incompetent, based in part on the fact that at the time of his competency examination he did not appear to understand the risks of self-incrimination if he made statements.

¶ 51     The People respond that under the totality of the circumstances, Vernagallo was engaged with law enforcement, responded appropriately to their questions, did not appear emotionally pressed or erratic, and affirmatively stated that he understood and waived his *Miranda* rights and was willing to speak to law enforcement.

¶ 52     Having independently reviewed the bodycam footage of Vernagallo's advisement, waiver, and subsequent interactions with the police, we conclude that the trial court did not err by finding that Vernagallo's waiver was knowing, voluntary, and intelligent. Although he did not choose to wear his shirt, we do not view that as indicative of a mental condition or disassociation. Vernagallo was sitting handcuffed in the back of the police cruiser on what appeared to be a warm August day. Thus, deciding not to put his shirt back on was not necessarily reflective of a mental condition.

¶ 53    But more importantly, Vernagallo listened to the *Miranda* advisement, responded "sir, yes sir" when asked if he understood his rights, and said "sure" when asked whether he wished to speak with law enforcement.  Thereafter, he responded appropriately in terms of substance, tone, and demeanor when responding to the officer's questions.  During this relatively short exchange (less than three minutes), Vernagallo never appeared disoriented, emotionally flat, or unable to understand the officer's questions.  He even apologized for "playing a joke [on his] sister" and for having the police called out for the incident.

¶ 54    True, as Vernagallo argues, he was subsequently found incompetent after two different competency evaluations.  While relevant, the competency evaluations were made at a later date and were based on a different set of criteria.  Thus, the subsequent incompetency findings do not control the question of whether Vernagallo knowingly and intelligently waived his *Miranda* rights.  And most importantly, we have reviewed the recording of Vernagallo's *Miranda* advisement and waiver, and it confirms that his waiver was knowing and intelligent.

¶ 55    Given the totality of the circumstances, we conclude that the trial court did not err by finding that Vernagallo's waiver of his *Miranda* rights was knowing and intelligently made and thereafter denying his motion to suppress.

## IV.    Prosecutorial Misconduct

¶ 56    Vernagallo argues that the prosecutor engaged in three instances of prosecutorial misconduct by (1) misstating the law during his opening statement; (2) inappropriately analogizing the incident to reporting a false bomb threat or pulling a fire alarm; and (3) offering an improper personal opinion as to Vernagallo's guilt during closing argument.  We address each argument below.

### A.    Standard of Review and Applicable Law

#### 1.    Preservation and Standard of Review

¶ 57    We engage in a two-step analysis to review prosecutorial misconduct claims.  *People v. Herold*, 2024 COA 53, ¶ 67.  First, we consider "whether the prosecutor's questionable conduct was improper based on the totality of the circumstances," and then we consider "whether such actions warrant reversal."  *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).

¶ 58    Prosecutors, "while free to strike hard blows, [are] not at liberty to strike foul ones." *Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005) (citing *Wilson v. People*, 743 P.2d 415, 418 (Colo. 1987) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). During closing argument, a prosecutor "may refer to the strength and significance of the evidence, conflicting evidence, and reasonable inferences that may be drawn from the evidence." *People v. Walters*, 148 P.3d 331, 334 (Colo. App. 2006). But prosecutors may not express their personal opinion that a defendant is guilty. *People v. Rhea*, 2014 COA 60, ¶ 80. "In determining the propriety of [such] statements, we consider 'the language used, the context in which the statement was made, and any other relevant factors.'" *People v. Whitman,* 205 P.3d 371, 384 (Colo. App. 2007).

¶ 59    Defense counsel objected to the prosecutor's bomb scare and fire alarm analogies during closing argument, and therefore, those claims are preserved. We review preserved claims of prosecutorial misconduct for harmless error. *People v. Licona-Ortega,* 2022 COA 27, ¶ 87. Under harmless error review, we will disregard the error unless it "substantially influenced the verdict or affected the

fairness of the trial proceedings." *Id.* (citing *Hagos v. People*, 2012 CO 63, ¶ 12).

¶ 60     The claims related to the prosecutor's opening statement about a joke and the portion of the closing argument related to personal opinions were not preserved. We review unpreserved claims for plain error. *Hagos*, ¶ 14. Plain error is obvious and substantial. *Id.* Reversal under those circumstances only occurs when the error "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." *Id.* (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)).

## 2.     Applicable Law

¶ 61     Menacing occurs when a person "by any threat or physical action, . . . *knowingly* places or attempts to place another person in fear of imminent serious bodily injury." § 18-3-206, C.R.S. 2025 (Emphasis added). "A person acts 'knowingly' . . . with respect to conduct or to a circumstance . . . when he is aware that his conduct is of such nature or that such circumstance exists." § 18-1-501(6), C.R.S 2025. "A person acts 'knowingly' . . . with respect to a result of his conduct, when he is aware that his conduct is practically

27

certain to cause the result." *Id.* Acting knowingly is distinct from a voluntary act, which is defined — in pertinent part — as "an act performed consciously as a result of effort or determination . . . ." § 18-1-501(9).

## B. Analysis

### 1. Opening Statement

¶ 62 Vernagallo contends that reversal is warranted because the prosecutor misstated the law during his opening statement by conflating the knowing mens rea element of menacing with a voluntary act, and because of the misstatement, his right to a fair trial was compromised.

¶ 63 The People respond that, when the prosecutor's comment is read in full context, it appropriately explained the "knowingly" mental state. Specifically, the People reason that the opening statement was made in response to the defense's theory that Vernagallo did not knowingly menace Bond and Adame because he was only joking. We agree that contrasting menacing with joking did not constitute prosecutorial misconduct.

¶ 64 During his opening, the prosecutor stated:

A person acts knowingly when he's aware that his conduct is of such nature or that such circumstance exists. A person acts knowingly with respect to a result of his conduct when he's aware that his conduct is practically certain to cause the result.

*We're not asking . . . if [this] is this a joke.* That's not the question. What does someone intend to do. You don't even have to go to what does someone intend to do. You're just being asked, *[did] he know what he was doing[?]* It's not an accident.

. . .

You don't even have to get to what he intended. You don't even get to ask that question. But you're told what he intended. You'll hear *what he intended was to put them in fear,* because he was bored. That's what we're here about. *He knew what he was doing. He knew exactly what he was doing, and that's exactly what the evidence will tell you.*

. . .

He knew that by taking out that gun, . . . pointing it at his sister's face, pointing it at her boyfriend, pulling the trigger, he knew exactly what he was doing, putting them in fear that that was a real gun and they were about to die. That's exactly what he was trying to do.

(Emphasis added.)

¶ 65     When viewed in context, the prosecutor's references to

whether Vernagallo consciously intended to menace Bond and

29

Adame did not misstate the meaning of knowingly or disavow the prosecution's obligation to prove the knowing element of menacing. Rather, the prosecution was simply attempting to rebut the argument that a defendant may avoid being found guilty of menacing simply by saying that the act was intended as a joke.

¶ 66 To establish that Vernagallo menaced Bond and Adame, the prosecution was required to prove that Vernagallo knew that his conduct was "practically certain" to cause the victims to believe that they were "in fear of imminent serious bodily injury." *See* § 18-3-206. While a portion of the prosecutor's statement focused on whether Vernagallo pulled the gun on them as a joke, the following paragraphs focused on whether Vernagallo intentionally acted in a manner that was practically certain to illicit fear, which goes toward whether Vernagallo's actions were knowing. *See* § 18-1-501(6).

¶ 67 The prosecutor properly urged the jury to consider whether, by pointing the revolver at his "sister's face, pointing it at her boyfriend, pulling the trigger, he knew exactly what he was doing, putting them in fear that that was a real gun and they were about to die." The argument does not constitute misconduct

### 2. Bomb Scare and Fire Alarm Analogies

¶ 68 Vernagallo next contends that the prosecution engaged in misconduct by analogizing the incident to calling in a bomb scare or pulling a fire alarm in a public space. We disagree.

During closing argument, the prosecutor said:

> [Prosecutor]: Remember, it's not a joke, it's a crime. You don't get to say, you know what, I think it would be funny to call 911 and call in a bomb scare. But I perceive that law enforcement's just going to have a good old laugh about this. They're going to chuckle about it. No. That's a crime. You may perceive it to be a joke, but that's a crime. I think it would be funny.
>
> [Defense Counsel]: Your Honor, I object. These are different statutes with different mental states.
>
> [Prosecutor responds and trial court overrules the objection.]
>
> [Prosecutor]: You think it's funny to say I'm going to pull the fire alarm in a theater; be a big joke. I'm going to pull a fire alarm at school because I want to get out of a test. It's a crime. It's not a joke. Just like you can say I think it would be funny to scare somebody by pointing what looks like a real gun in their face. Crime, not a joke. The statute doesn't say what does [Vernagallo] perceive, the statute says is he aware that his conduct is practically certain to cause the result.

31

¶ 69    Vernagallo contends that comparing the incident to pulling a fire alarm or calling in a false bomb threat was reversible error because the public nature of both analogies is not comparable and had the potential to improperly appeal to the jury's sympathy. The People disagree, noting that the analogies properly focused on the actor's intentional conduct, which goes towards whether Vernagallo acted knowingly.

¶ 70    Vernagallo stated that he was only joking and was not trying to upset Bond or Adame. Vernagallo also defended the charges on the theory that his intention was to play a prank, so the prosecution properly explained how, regardless of whether Vernagallo intended to play a joke, the jury's focus should be on whether in doing so he knowingly placed Bond and Adame "in fear of imminent serious bodily injury." § 18-3-206.

¶ 71    Furthermore, we disagree with the assertion that Vernagallo's actions were limited to Bond and Adame. He got into his car and followed them down the street, and the neighbor also believed that he was armed with a weapon. That behavior occurred in public and had the potential to scare others.

¶ 72    Thus, we reject Vernagallo's contention that the prosecutor engaged in misconduct by analogizing the incident to pulling a fire alarm or calling in a bomb threat.

### 3.    Opinion Argument

¶ 73    Vernagallo next contends that the prosecution improperly expressed a personal opinion about his guilt during closing argument.

¶ 74    During the initial closing, the prosecutor stated, without objection, the following:

> Each one of these charges has been proven beyond a reasonable doubt. It was the defendant. It was here in Douglas County, on August 11th of 2021. He knew exactly what he was doing. And not only did he know what he was doing, that's what he intended to do. That was his goal, was to put [the victims] in fear of imminent serious bodily injury. And he used this replica gun to do it. He's guilty of both of those charges.

During rebuttal the prosecutor also stated, without objection,

> There's only one thing that you're trying to do when you point this at someone's head. There's only one thing you're trying to do when you're holding that gun out of a car as two people are running for their lives. You're menacing [Bond] and you're menacing [Adame]. The defendant is guilty on both of those counts.

¶ 75    Vernagallo argues that these statements reflected the prosecutor's personal opinion that Vernagallo was guilty. We disagree.

¶ 76    "[P]rosecutorial remarks that evidence personal opinion, personal knowledge, or inflame the passions of the jury are improper." *Domingo-Gomez*, 125 P.3d at 1050. To determine whether a prosecutor's remarks are improper, the court must look at the language used in context of the entire statement. *Sellers*, ¶ 25. Here, the comments were not preceded by statements that indicated that they were based on the prosecutor's beliefs such as "I believe" or any type of similar statement that would lead the jury to believe that the statements are tied to the prosecutor's personal beliefs or personal knowledge about the situation. The statements related to Vernagallo's guilt were based on the evidence and the jury instructions. *People v. Villa*, 240 P.3d 343, 358 (Colo. App. 2009) (explaining that asking a jury to find a defendant guilty is simply asking the jury to make a reasonable inference about the evidence). In context, the argument did not cross over into expressing a personal belief. Therefore, we discern no error, much less plain

error, associated with the trial court's decision not to unilaterally address this argument.

## V. Cumulative Error

¶ 77 Finally, Vernagallo contends that the cumulative impact of the asserted errors requires reversal. "The doctrine of cumulative error is based on the notion that multiple errors, in isolation, may be viewed as harmless, but the synergistic effect of the multiple errors may be so prejudicial that they deprive a defendant of a fair trial." *People v. Serna-Lopez*, 2023 COA 21, ¶ 47. "For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not." *Howard-Walker v. People*, 2019 CO 69, ¶ 25. Because we discern no error, much less multiple errors, Vernagallo's cumulative error claim necessarily fails.

## VI. Disposition

¶ 78 The judgment is affirmed.

JUDGE BROWN and JUDGE BERGER concur.